FILED
2021 Apr-22 PM 02:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNDER SEAL | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No:_____ |
| | ) | |
| | ) | **FILED IN CAMERA AND** |
| UNDER SEAL | ) | **UNDER SEAL** |
| | ) | |
| | ) | |
| | ) | |
| Defendants | ) | **DO NOT PUT ON PACER** |
| | ) | |
| | ) | **DEMAND FOR JURY** |
| | ) | |

1

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* Andrew D. Wilkerson, M.D., | ) | |
| and Ramnarine Boodoo, M.D., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No:_____ |
| | ) | |
| LIFEPOINT HEALTH, INC.; | ) | |
| RCHP- FLORENCE, LLC d/b/a SHOALS | ) | **FILED IN CAMERA** |
| HOSPITAL; PRIME HEALTHCARE | ) | **AND UNDER SEAL** |
| SERVICES, INC.; PRIME HEALTHCARE | ) | |
| SERVICES—GADSDEN,  LLC; | ) | |
| RIVERVIEW REGIONAL MEDICAL | ) | **DO NOT PUT IN PACER** |
| CENTER, LLC; RIVER REGION | ) | |
| PSYCHIATRY ASSOCIATES, LLC; | ) | |
| ALABAMA PSYCHIATRY, LLC; | ) | |
| and SHANKAR B. | ) | **DEMAND FOR JURY** |
| YALAMANCHILI | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## *QUI TAM* COMPLAINT

Relators Dr. Andrew D. Wilkerson, M.D. and Dr. Ramnarine Boodoo, M.D.,
on behalf of themselves and on behalf of the United States of America, bring this
*qui tam* complaint against Defendants for violations of the False Claims Act, 31
U.S.C. § 3729 *et seq*. (the "FCA") and violations of the Anti-Kickback Statute 42
U.S.C. § 1320a-7b(b) ("AKS").

## STATEMENT OF THE CASE

1.     This case involves an illegal kickback scheme whereby Defendant Dr. Yalamanchili, through Defendants Alabama Psychiatry, LLC and River Region Psychiatry Associates, LLC, is paid ostensibly to serve as the medical director of psychiatric units in multiple hospitals, including as medical director of Defendant Shoals Hospital—which is owned and operated by Defendant LifePoint—and medical director of Defendant Riverview Hospital—which is owned and operated by Defendant Prime.  In actuality, Defendant Yalamanchili, Alabama Psychiatry, and River Region are paid illegal remuneration disguised as payments for medical director services to admit patients and retain patients in inpatient psychiatric units solely for the Defendant hospitals' profit, with little if any concern for patient welfare and often to the detriment of the patient.

2.     Defendants focus their efforts, and remuneration, upon maximizing Medicare billing for in-patient geriatric psychiatry services.  Defendants do so because inpatient psychiatric facilities (IPF), such as those at Shoals Hospital and Riverview Medical Center, are reimbursed by Medicare pursuant to a unique, per-diem, payment system.  As Defendants have fully recognized, the unique IPF billing system can be highly profitable when exploited.

3.     However, to charge Medicare for the higher, per-diem, reimbursement provided for under the IPF payment system, facilities must first qualify as IPFs under

Medicare regulations. To do so, facilities must, among other requirements, have written admission criteria that are applied uniformly to both Medicare and non-Medicare patients. Once qualified to bill under the IPF system, IPFs must provide specialized care required to appropriately care for psychiatric patients, including "active treatment" of the patient's psychiatric diagnosis as well as meeting specific staffing requirements. Of course, as with all services paid for by Medicare, inpatient psychiatric care billed to Medicare must be reasonable and medically necessary. More importantly and regardless of whether they are reasonably and medically necessary, however, all payments billed to Medicare must be untainted by kickbacks.

4.      In pursuit of profits from Medicare per-diem IPF billings, Defendants disregard each of these material conditions of payment. Defendants ignore admission criteria to "cherry-pick" inappropriate but profitable Medicare patients while eschewing appropriate and suffering non-Medicare patients. Defendants do not provide the specialized "active treatment" required to bill under the IPF per-diem system. Defendant Yalamanchili along with LifePoint and Prime aggressively enforce admission and length of stay quotas—regardless of patient eligibility, medical appropriateness, or concern for patient well-being. And at the heart of their disregard for patient care is a mutually-beneficial kickback scheme.

5.      Defendants cause and submit improper and false billings to the United States through the Medicare program, in violation of the False Claims Act, by, *inter*

*alia,* paying Dr. Yalamanchili, Alabama Psychiatry, and River Region in violation of the federal Anti-Kickback Statute.

6.     Relator Boodoo and Relator Wilkerson witnessed this scheme in action at different hospitals, and under different management, but the fraud witnessed was identical—the respective hospital management sought to fraudulently maximize revenue under the profitable Medicare IPF reimbursement structure.   The common theme at each hospital was Dr. Yalamanchili and his companies were more than willing to cause and facilitate this fraud in exchange for illegal remuneration disguised as medical director fees and billing rights.

## JURISDICTION AND VENUE

7.     This action arises under the FCA. 31 U.S.C. § 3729 *et seq.*  Defendants submitted and caused the submission of false claims in violation of 31 U.S.C. §3729(a)(1)(A).  In so doing, Defendants made or used false records material to these false claims in violation of 31 U.S.C. §3729(a)(1)(B), knowingly and improperly avoided obligations to repay money to Medicare in violation of 31 U.S.C. § 3729(a)(1)(G) and conspired to violate the False Claims Act in violation of 31 U.S.C. § 3729(a)(1)(C).

8.     Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

9.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact business in the State of Alabama, transact business in this judicial district, and can be found here.

**PARTIES**

- **The "Yalamanchili Defendants"**

10.     Defendant Dr. Shankar B. Yalamanchili ("Dr. Yalamanchili") is a licensed psychiatrist and the President and founder of Defendant River Region Psychiatry Associates, LLC ("River Region") and is the owner of Defendant Alabama Psychiatry, L.L.C. ("Alabama Psychiatry").

11.     Defendant River Region Psychiatry Associates, LLC ("River Region") is a group medical practice founded by Dr. Yalamanchili that provides inpatient psychiatric services and operates outpatient psychiatric facilities in Alabama, Tennessee, Georgia, and Kentucky.   Defendant River Region is headquartered in Montgomery, Alabama.

12.     Defendant Alabama Psychiatry is a division of Defendant River Region Psychiatry Associates, LLC ("Alabama Psychiatry"). River Region and Alabama Psychiatry contract with inpatient psychiatric facilities throughout its footprint, including Defendant Shoals Hospital and Defendant Riverview Regional Medical Center.   As Defendant Yalamanchili directs all operations of Defendant River

6

Region and Defendant Alabama Psychiatry – including the fraud alleged herein – these Dr. Yalamanchili, Alabama Psychiatry, and River Region are referred to collectively herein as "the Yalamanchili Defendants."

- **The LifePoint Defendants**

13.    Defendant LifePoint Health, Inc. ("LifePoint") is a privately-held Delaware corporation headquartered in Brentwood, Tennessee.  LifePoint owns and operates approximately 88 hospital campuses in 29 states, including Shoals Hospital and its designated "sister hospital" North Alabama Medical Center ("NAMC"). LifePoint assumed management of Shoals Hospital and the Senior Care Center on or about March 2019.

14.    Defendant RCHP-Florence, LLC d/b/a Shoals Hospital is a Delaware limited liability company headquartered in Brentwood, Tennessee.  RCHP-Florence operates Shoals Hospital in Muscle Shoals, Alabama.   The hospital includes the Shoals Senior Care Center (Shoals IPF)—which is a 30-bed inpatient psychiatric facility—which submits claims to Medicare under the Medicare IPF per-diem payment system.

- **The Prime Defendants**

15.    Defendant Prime Healthcare Services, Inc., ("Prime") is a Delaware corporation headquartered in Ontario, California.  Prime operates forty-six hospitals

and more than three hundred outpatient locations in fourteen states, including Defendant Riverview Regional Medical Center, LLC.

16.   Defendant Prime Healthcare Services – Gadsden, LLC ("Prime Gadsden") is a Delaware limited liability corporation, which owns, operates and/or manages Riverview Regional Medical Center, LLC.

17.   Defendant Riverview Regional Medical Center, LLC ("Riverview Regional") is a Delaware limited liability company and hospital located in Gadsden, Alabama. Riverview Regional was acquired by Prime in 2015. Riverview Regional operates an 18-bed inpatient geriatric psychiatric unit (Riverview IPF)—which submits claims to Medicare under the Medicare IPF per-diem payment system.

- **Relators**

18.   Relator Dr. Ramnarine Boodoo is a licensed psychiatrist and Diplomate of the American Board of Psychiatry and Neurology. He became employed by Defendant Alabama Psychiatry on June 8, 2018. As an employee of Alabama Psychiatry and under the direction of its owner, Dr. Yalamanchili, Dr. Boodoo provided inpatient psychiatry services at Defendant Riverview Regional until he was terminated in December 2019.

19.   Dr. Boodoo's termination violated 31 U.S.C. 3730(h).

20.   Through his employment with Alabama Psychiatry and experience at Riverview Regional Medical Center, Dr. Boodoo has knowledge that Dr.

Yalamanchili, the Yalamanchili Defendants and the Prime Healthcare Defendants: (a) falsely claim that Riverview IPF meets the requirements to bill as an IPF, (b) do not provide the required active psychiatric treatment required to submit IPF billings, and (c) knowingly submit and cause to be submitted false claims for unnecessary inpatient psychiatric services at Riverview.

21. Dr. Boodoo is personally aware that the Yalamanchili Defendants receive illegal remuneration to cause the submission such false claims.

22. Relator Dr. Andrew D. Wilkerson is a licensed psychiatrist and Diplomate of the American Board of Psychiatry and Neurology.

23. Relator Wilkerson served as Medical Director of the Shoals Hospital Senior Care Center from November 2017 until on or about May 2020, when he was terminated as Medical Director.

24. Relator Wilkerson was terminated for his efforts to prevent false claims from being submitted, in violation of 31 U.S.C. §3730(h).

25. During his tenure as Medical Director at Shoals Hospital, Relator Wilkerson was pressured to increase reimbursement for the Shoals IPF by admitting and retaining inappropriate psychiatric patients. Through this experience, Relator Wilkerson has knowledge that the LifePoint Defendants (a) falsely claim that Riverview IPF meets the requirements to bill as an IPF, (b) do not provide the required active psychiatric treatment required to submit IPF billings, (c) and

knowingly submit and cause to be submitted false claims for unnecessary inpatient psychiatric services.

26.     Relator Wilkerson continues to provide outpatient psychiatric treatment in the Muscle Shoals area and often treats patients that were admitted to the Shoals Hospital IPF by Dr. Yalamanchili.

27.     Through this experience, Relator Wilkerson quickly recognized that the Shoals IPF patient census and average length of stay skyrocketed under Dr. Yalamanchili's medical directorship and that many patients admitted to the Shoals IPF are patently inappropriate for inpatient psychiatric care.

28.     Prior to filing this Complaint, Relators Wilkerson and Boodoo voluntarily disclosed to the United States the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3730(e)(4)(A), Relators are the original source of the information for purposes of that Section. Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions and have voluntarily provided that information to the United States before filing this Complaint as contemplated by 31 U.S.C. § 3730(e)(4)(B)(2).

## APPLICABLE LAW

**A. The False Claims Act**

29.     The FCA, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104– 410 [1]), plus treble damages. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

30.     Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

31.     The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer,

employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

32.    The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

33.    Any overpayment retained by a person after the later of 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due, if applicable, is an "obligation" as defined by the FCA. 42 U.S.C. § 1320a-7k(d).

34.    Additionally, the FCA provides relief from retaliatory actions in general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of

lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations the FCA. 31 U.S.C. § 3730(h).

## B. The Anti-Kickback Statute

35.     Soon after the establishment of the Medicare system in 1965, it became apparent that the deep pockets of the national healthcare system were being abused through unethical and kickback-tainted referrals by unscrupulous physicians and medical entities.  In response, Congress enacted the federal Anti-Kickback Statute ("AKS") and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare funded medical services.  *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). As unethical and illegal referral patterns morphed and proliferated, Congress amended the AKS in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated violation of the AKS from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

36.     "The [AKS] was enacted to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services." *U.S. v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) citing Health Res. &

Serv. Admin., Program Assistance Letter 1995–10, *Guidance on the Federal Anti–*

*Kickback Law.*

    37.    In part, the AKS provides as follows: (b) Illegal remunerations—

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

    (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

38.     The AKS specifically provides that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. §1320a-7b(g).

39.     A person need not have actual knowledge of the AKS or specific intent to commit a violation of this section. 42 U.S.C. § 1320a-7b(h).

40.     Even if remuneration is paid, in part, for services rendered, if one purpose of the payor's provision of payment is to induce referral of items or services that may be paid for by federal health care programs, the arrangement violates the Anti-Kickback Statute. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir., 2020) *citing U.S. v. Greber*, 760 F.2d 68, 69 (3rd Cir. 1985). However, a recipient's motivation for accepting kickbacks is irrelevant. The Anti-Kickback Statute requires *no* proof of the recipient's motivation for accepting the illegal payment, so long as the recipient accepts the kickback knowingly and willfully. *United States v. Shah*, 981 F.3d 920, 926 (11th Cir., 2020).

41.     For purposes of applying the AKS, a physician referring and ordering an inpatient hospital admission is often defined as a "gatekeeping physician," tasked with proposing plans of care and certifying the legitimacy of the plans and the necessity of the proposed services. *United States v. Patel*, 17 F.Supp.3d 814, 830 (N.D. Ill. 2014). "The potential for increased costs to the Medicare system [which is the primary purpose of the Anti-Kickback Statute] is particularly acute where a

15

medical service provider that gets paid per service rendered is responsible for proposing plans of care, and the gatekeeping physician tasked with certifying the legitimacy of the plans and the necessity of the proposed services is given remuneration each time he approves or reapproves a plan." *Id.* Protection from such corruption lies at the foundation of the Anti-Kickback Statue which the Defendants habitually violated.

### C. The Medicare Program

42.    The Medicare Program is established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, and provides health insurance coverage for eligible citizens.   The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.   CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MACs). 42 U.S.C. § 1395kk-1; 42 U.S.C. § 1395ddd.

43.    The Medicare Program is segmented into four parts. Medicare Part A is the portion of the Medicare program that covers payment for inpatient hospital care and other institutional care, including payment to inpatient psychiatric facilities under the IPF per diem reimbursement structure.  *See* 42 U.S.C. §§1395c-1395i-4; 42 C.F.R. 412.400.

44.     Medicare Part B covers services and supplies furnished by physicians or others in conjunction with inpatient hospital admissions.   54 Fed. Reg. 4302, 4303–04 (Jan. 30, 1989).   Under Medicare Part B, predetermined amounts are paid for designated services furnished to Medicare beneficiaries.   These services are identified by codes established under the Centers for Medicare & Medicaid Services Common Procedure Coding System (HCPCS), which is equivalent to the Current Procedural Terminology (CPT) coding system.

45.     In the context of inpatient hospital billings, physicians' services are often referred to as "professional fee" or "pro fee" services and referenced by CPT codes.   The most common "professional fee" service performed by a physician while the patient is admitted to inpatient psychiatric services are billed under the set of CPT codes corresponding to "Subsequent Hospital Visits" (CPT Codes 99231-99233).   This set of codes increase in significance and reimbursement (from 99231 to 99233) based on claimed time spent with the patient and thoroughness of examination performed by the physician.

**1. IPF PPS Billing by Psychiatric Facilities**

46.     When a patient is admitted to a hospital, Medicare typically pays the hospital for such care under the inpatient prospective payment system (IPPS) set forth at 42 CFR § 412.1(a)(1), *et seq*.   The IPPS system provides payment for the costs of inpatient hospital services based on prospectively determined rates, which

are applied on a *per discharge basis.* 42 CFR § 412.1(a)(1)(emphasis added). Under the IPPS system, when a patient is admitted to inpatient hospital treatment under a certain diagnosis (or set of diagnoses), a Diagnosis Related Group (DRG) is assigned for that admission and the hospital receives a set amount for a patient's entire hospital stay—regardless of how long the patient is in the hospital.

47.   In contrast, inpatient psychiatric facilities, such as the Senior Care Center at Shoals Hospital and the geriatric psychiatric inpatient unit at Riverview, bill under a separate system specifically for inpatient psychiatric care known as the Inpatient Psychiatric Facility Prospective Payment System ("IPF PPS"). *See* 42 CFR § § 412.25, 412.27. Under the IPF PPS, Medicare pays IPFs a standard *per diem rate* for inpatient services, modified for patient and facility characteristics and length of stay. A separate PPS for inpatient psychiatric care exists because those facilities are required to provide specific specialized psychiatric care and more extensive general care than acute-care general hospitals.

48.   Under the IPF PPS, Medicare pays certified IPFs at a set rate for each day a patient is admitted to the IPF. Specifically, as of October 1, 2020, the IPF PPS federal *per diem* base rate was increased from $798.55 to $815.22.[1] While that base IPF PPS *per diem* rate can fluctuate based on a variety of factors, including the

---

[1] *See* Fed. Reg., *Medicare Program; FY 2021 Inpatient Psychiatric Facilities Prospective Payment System (IPF PPS) and Special Requirements for Psychiatric Hospitals for Fiscal Year Beginning October 1, 2020 (FY 2021),* 85 FR 47042.

location of the facility, the age of the patient, and patient co-morbidities, the IPF PPS is designed to provide higher reimbursement to the psychiatric facilities than they would receive under Part A's standard facility fee payments to hospitals.[2]

49.     Payment from an IPF PPS also varies over the length of a patient's stay, with the facility receiving upward adjustments for the first several days of the patient's stay with small but steady decreases in the payments over time—until the patient's 22nd day in the IPF, at which point the per diem rate remains constant. *See* Medicare Claims Processing Manual, Ch. 3 Inpatient Hospital Billing, § 190.5.5.

### 2.  IPF PPS Conditions of Payment

50.     To bill and receive payment under the IPF PPS system, facilities must meet certain requirements.  Specifically, to be qualified as a IPF and be excluded from the general IPPS system, the IPF "must have written admission criteria that are applied uniformly to both Medicare and non-Medicare patients."  42 C.F.R. § 412.25.  The requirement to apply the IPF's written admission criteria uniformly is a condition of payment under the IPF PPS.  42 C.F.R. 412.404.  This requirement is critical because it ensures that IPFs are not "cherry-picking" profitable Medicare patients (billed under the IPF PPS), while not admitting non-Medicare patients who

---

[2]  CMS MLN Booklet, INPATIENT PSYCHIATRIC FACILITY PROSPECTIVE PAYMENT SYSTEM, ICN MLN006839 February 2020, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Inpatient-Psychiatric-Facility-Prospective-Payment-System.pdf.

may meet the IPFs written admission criteria, but would be less profitable for the facility. As detailed herein, Defendants do just that.

51.    Defendants LifePoint and Shoals Hospital routinely disregard written admission criteria and admit ineligible patients to the Shoals Senior Center IPF simply because they are insured by Medicare and LifePoint can bill the profitable IPF PPS.  Under the Yalamanchili Defendants Medical Directorship, Defendants Prime and Riverview do not even attempt to use written admission criteria, but simply manipulate admission decisions based on patients' insurance coverage—overwhelmingly admitting and retaining Medicare patients to exploit the IPF PPS system.

52.    Additionally, CMS requires IPFs to adhere to specific admission criteria as conditions of payment under the IPF PPS.  Specifically, IPFs are required to admit only patients "whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting, of a psychiatric principal diagnosis that is listed in the International Classification of Diseases, Tenth Revision. (ICD-10)." 42 CFR § 412.27(a); *See* Medicare Benefit Policy Manual Ch. 2 Inpatient Psychiatric Hospital Services §20 (Rev. 253, 12-14-18).

53.    The concept of "active treatment" is critical is assessing whether IPF's are providing the specialized psychiatric care that is required to bill and receive

Medicare reimbursement under the IPF PPS. Payment for IPF services is to be made only for "active treatment" that can reasonably be expected to improve the patient's condition. *See* Medicare Benefit Policy Manual Ch. 2 Inpatient Psychiatric Hospital Services §§ 30.2.2

54.    CMS has further explained that "active treatment" in an IPF is necessarily different from the "skilled care" provided by general hospitals. For services at an IPF to qualify as "active treatment," such services "must be: (1) provided under an individualized treatment or diagnostic plan; (2) reasonably expected to improve the patient's condition or for the purpose of diagnosis; and (3) supervised and evaluated by a physician." *See* Medicare Benefit Policy Manual Ch. 2 Inpatient Psychiatric Hospital Services §§ 30.2.2, 30.2.2.1.

55.    Physician participation in the services is an essential ingredient of active treatment. *Id.* at § 30.2.3.

56.    Moreover, to bill under the IPF PPS, each patient must have an individual comprehensive treatment plan that must be based on an inventory of the patient's strengths and disabilities. The written plan must include—(1) A substantiated diagnosis; (2) Short-term and long-range goals; (3) The specific treatment modalities utilized; (4) The responsibilities of each member of the treatment team; and (5) Adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out. *Id.* at § 30.3.1.

57.    "Active treatment is an essential requirement for inpatient psychiatric care. Active treatment is a clinical process involving ongoing assessment, diagnosis, intervention, evaluation of care and treatment, and planning for discharge and aftercare, under the direction of a psychiatrist. The patient is in the hospital because it has been determined that the patient requires intensive, 24 hour, specialized psychiatric intervention that cannot be provided outside the psychiatric hospital."[3]

58.    Further, "Active treatment" must, at a minimum, be designed both to reduce or control the patient's psychotic or neurotic symptoms that necessitated hospitalization and improve the patient's level of functioning. Medicare Benefit Policy Manual Ch. 2 Inpatient Psychiatric Hospital Services §§ 30.3.2

59.    IPFs must also meet specific personnel requirements to be able to provide the "active treatment" required for IPF billing.  To bill as an IPF, IPFs must employ or undertake to provide adequate numbers of qualified professional, technical and consultative personnel to: (1) evaluate patients, (2) formulate written individualized, comprehensive treatment plans, (3) provide active treatment measures; and (4) engage in discharge planning.  42 C.F.R. § 482.62

---

[3] *See* CMS State Operations Manual, Appendix A, Survey Protocol, Regulations and Interpretive Guidelines for Hospitals § 482.61(c)(2)  (Rev. 200, 02-21-20).
https://www.cms.gov/Regulations-and-
Guidance/Guidance/Manuals/downloads/som107ap_a_hospitals.pdf

60.    IPFs must have physicians and other appropriate professional personnel available to provide necessary medical and surgical diagnostic and treatment services.  Medicare Benefit Policy Manual Ch. 2 §40

61.    IPFs must provide services under the supervision of a clinical director, service chief or equivalent who is qualified to provide the leadership required for an intensive treatment program. *Id.* at § 40.1. The number and qualifications of doctors of medicine and osteopathy must be adequate to provide essential psychiatric services.  *Id.* Further, the director must monitor and evaluate the quality and appropriateness of services and treatment provided by the medical staff. *Id.*

62.    IPFs must provide a therapeutic activities program that is appropriate to the needs and interests of patients and be directed toward restoring and maintaining optimal level of physical and psychosocial functioning.  Medicare Benefit Policy Manual Ch. 2 §70.  The number of qualified therapists, support personnel and consultants must be adequate to provide comprehensive therapeutic activities consistent with each patient's active treatment program.  Medicare Benefit Policy Manual Ch. 2 §70.

### 3. Billing Procedures and Certifications Required to Bill Medicare for IPF Services—Which Defendants Falsified.

63.    Medicare pays for IPF services only if a physician certifies that the inpatient psychiatric facility admission was medically necessary.  Medicare Benefit Policy Manual Ch. 2 § 30.2.1; Medicare Benefit Policy Manual Ch. 4 § 10.9.

64.    "The content requirements of the certification differ from those for other hospitals because the care furnished in inpatient psychiatric facilities is often purely custodial and thus not covered under Medicare.   The purpose of the statements, therefore is to help ensure that Medicare pays only for the services of the type appropriate for Medicare coverage."  Medicare Benefit Policy Manual Ch. 2 § 30.2.1.1.   Accordingly, IPF certifications "must provide, with respect to IPF services, documentation that the services furnished can reasonably be expected to improve the patient's condition or for diagnostic study." *Id.*

65.    "If the patient continues to require active inpatient psychiatric treatment, then a physician must recertify as of the 12th day of hospitalization (with subsequent recertifications required at intervals established by the IPF's Utilization Review committee on a case-by-case basis, but no less frequently than every 30 days)." Medicare Benefit Policy Manual Ch. 2 § 30.2.1.2. This recertification requires the physician to attest "that the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition, or for diagnostic study, and that the patient continues to need, on a daily basis, active treatment furnished directly by, or requiring the supervision of, inpatient psychiatric facility personnel." *Id.*

66.    To bill Medicare as an institutional provider, Defendants Shoals Hospital and Riverview were each required to complete a Medicare Enrollment

Application. This application is Form CMS 855-A. Among other disclosures and certifications required, Form CMS-855A contains a "certification statement and signature" and requires the physician to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

67.    As a physician, or entity billing on behalf of a physician, Defendants Yalamanchili, River Region, and Alabama Psychiatry must complete a Medicare Enrollment Application to be able to bill Medicare for professional claims. This application is Form CMS-855I. Among other disclosures and certifications required, Form CMS-855I contains a "certification statement and signature" and requires the physician to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

Form CMS-855I

68.    Further, Form CMS-855I and Form CMS-855A requires the certification:

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

69.    Hospitals submit claims for inpatient care, including IPF PPS claims under Medicare Part A using an institutional claim format known as the ASC X12 837I, or where permissible, the hardcopy version Form CMS-1450.  ASC X12 837I and Form CMS-1450 are processed and paid for by the Medicare Administrative Contractor responsible for processing and paying the hospital's claims.  *See* Medicare Claims Processing Manual Ch. 3 § 10.1.  Submission of a ASC X12 837 I or Form CMS-1450 requires the following certification:

"Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

70.    At the end of the fiscal year, CMS requires hospitals to file an annual "cost report," which is CMS Form 2552. The hospital cost report is the final claim a provider submits to a MAC for items and services rendered to Medicare beneficiaries during that fiscal year. Included in the hospital cost report is the stated amount of Medicare Part A reimbursement the hospital believes is due for the year or the amount of excess reimbursement the hospital received from interim payments which the hospital must refund to Medicare. *See* U.S.C. § 1395(g)(a); 42 C.F.R. § 413.24.

Medicare relies on the hospital cost report to determine whether the provider is entitled to more reimbursement than it has received through interim payments or whether the provider has been overpaid and must refund Medicare a portion of the interim payments. 42 C.F.R §§ 405.1803; 413.60. Payments under the IPF PPS system are claimed on the annual cost report.

71.    When submitting a hospital cost report, a provider must also submit a hard copy of a "settlement summary," which is a statement of certain worksheet totals – related to the payment for services requested and a "certification statement." 42 CFR § 413(f)(4)(iv).

72.    The certification statement is required to be signed by the hospital's administrator or chief financial officer and submitted with the cost report, and includes the following section:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

42 CFR § 413.24(f)(4)(iv); FORM CMS-2552-10.

73.    The "certification statement" also requires the hospital's administrator or chief financial officer to certify:

27

I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

FORM CMS-2552-10.

74.    Therefore, each hospital cost report must provide an express, material, certification that the services and claims submitted in the report were billed in compliance with applicable laws and regulations, including the AKS.

75.    Healthcare providers, such as the Yalamanchili Defendants submit "professional fee" claims covered by Medicare Part B by submitting the ASC X12 837 professional claim format, or where permissible Form CMS 1500. *See* Medicare Claims Processing Manual Ch. 3 § 10.1.

76.    Form CMS 1500 includes this Certification and Notice provision:

This is to certify that the foregoing information is true, accurate and complete…this claim whether submitted by me or on behalf of my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute…services on this form were medically necessary…I certify that the services listed above were medically indicated and necessary to the health of this patient… I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal or State laws.

77.    Additionally, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A).  Medicare providers may not bill the United States for medically

unnecessary services or procedures performed solely for the profit of the provider.
*Id.*

## DEFENDANTS' FALSE CLAIMS

**I.     Relator Wilkerson's Knowledge of the LifePoint and Yalamanchili Defendants' False Claims.**

78.     Since 2017, Relator Dr. Andrew D. Wilkerson, M.D. has been the sole physician employed by Serenus Senior Care Advisors, PLLC ("Serenus") and the physician collaborator of Serenus' Nurse Practitioner Dewayne Sneed.

79.     In November 2017, Serenus entered into a three-year Professional Services Agreement with Defendant RCHP-Florence to provide professional psychiatric services to the Shoals Hospital Senior Care Center (Shoals IPF). Pursuant to this agreement, Relator Wilkerson—through Serenus—was the independent contractor Medical Director of the Shoals IPF, and a member of the medical staff of Shoals Hospital.

80.     Under this agreement, Serenus was an independent contractor of LifePoint and paid $150,000 annually to perform medical director services and retained the right to bill and collect all "professional fee" billings performed under the Medical Directorship. This contractual arrangement of a set fee for performance of duties and availability plus the right to collect professional fee billings is ubiquitous in Medical Director contracts.

81.    Within the Medicare IPF regulatory structure, this agreement made Relator Wilkerson the "clinical director" of the Shoals Senior Care Center and responsible for monitoring and evaluating the quality and appropriateness of services and treatment provided by the medical staff.  *See* Medicare Benefit Policy Manual Ch. 2 §40.1.  In this role, Dr. Wilkerson was responsible for certifying that the inpatient psychiatric facility admissions were medically necessary.    Medicare Benefit Policy Manual Ch. 2 § 30.2.1.

82.    Despite these clinical responsibilities specifically conferred upon Dr. Wilkerson, soon after becoming the Medical Director of the Shoals Hospital IPF, Dr. Wilkerson quickly recognized that Defendant Shoals Hospital management operated by seeking to fraudulently maximize reimbursement from profitable per diem IPF PPS reimbursement, circumventing his role.

## A. Defendant LifePoint and Shoals Hospital Improper Influence and Institutional Structures Are Designed to Cause False Claims.

83.    Shoals management, specifically Shoals Administrator Kidada Hawkins, sought to unduly influence and pressure Relator Wilkerson to admit more patients to the Shoals IPF and retain patients longer—all so Shoals could maximize its revenue under the profitable Medicare IPF PPS system.

84.    When Defendant LifePoint took over Shoals Hospital in March 2019, the pressure to admit and retain became more intense, specifically from Shoals Chief Operating Officer/Chief Financial Officer (COO/CFO) Bradley Boggus.  Defendant

LifePoint and Defendant Shoals Hospital enforced strict admission and length of stay mandates upon the Shoals IPF—including continually trying to influence Dr. Wilkerson to keep IPF patients for at least 14 days of per-diem billing.

85.    From the outset of LifePoint's operation of Shoals Hospital, LifePoint and Boggus were unhappy with Dr. Wilkerson's admissions and average length of stay in the Shoals IPF and continually pressured Dr. Wilkerson to admit more patients and retain patients longer.  In these efforts, Boggus—who is not clinically trained—never provided any medical justification for admitting more patients or keeping patients longer.

86.    Defendant LifePoint operated Shoals hospital with an institutional focus of shifting patients from the emergency room setting, or acute care setting to the more profitable Shoals IPF—regardless of whether the patients had a legitimate psychiatric diagnosis that would qualify these patients for active psychiatric treatment and thus allow IPF treatment and billing.

87.    Specifically, Shoals implemented a system whereby if a Medicare patient presented with characteristics could even be remotely considered for admission for the Shoals IPF, COO/CFO Bradley Boggus—who was not clinically trained—would be alerted and begin pressuring Dr. Wilkerson or other staff to admit the patient to the Shoals IPF.  Boggus would utilize social workers such as Kyle Smith and Leah Chandler as well as Shoals Emergency Room Physicians such as

Dr. John Ambury to funnel patients to the Shoals IPF. If Relator Wilkerson determined that Medicare patient was ineligible for IPF admission, Boggus would intervene and have Shoals employees such as Mr. Smith and Ms. Chandler attempt to present additional information to attempt to change Relator Wilkerson's medical judgment.

88.    While LifePoint and Boggus always questioned and pressured Relator Wilkerson regarding Medicare patients that he determined to be ineligible for IPF admission, they never questioned Relator Wilkerson about any Medicare patient that he determined was eligible for IPF admission. In other words, Lifepoint and Boggus only questioned Relator Wilkerson's medical judgment when the judgment resulted in lower profitability from the Medicare system.

89.    LifePoint also sought to influence Relator Wilkerson's medical judgment by pleading with him that more patients would need to be admitted to the Shoals IPF or staff would be terminated. Specifically, Kyle Smith and Leah Chandler would attend meetings with Boggus and afterward plead with Dr. Wilkerson that more patients needed to be admitted or they would lose their jobs.

90.    Conversely, if the patient was insured by Medicaid or uninsured, Shoals Management refused admission to the Shoals IPF—even if the patient was appropriate for IPF admission because IPF admission did not result in a higher per diem payment.

91.    If a patient was insured by a Medicare Advantage plan under Medicare Part C, LifePoint—primarily through Bradley Boggus—would pressure Dr. Wilkerson and Serenus NP Dwayne Sneed to admit the patient, regardless of eligibility.  However, patients insured under Medicare Part C would be retained in the Shoals IPF for shorter lengths of stay than traditional Medicare patients because the Medicare Advantage plans would actively monitor patient length of stay and limit unnecessary lengths of stay.  Whereas due to a lack of active monitoring of clinical appropriateness by the traditional Medicare system, LifePoint viewed traditional Medicare patients as a blank check of per-diem billings to be kept in a locked inpatient psychiatric unit as long as it profited the company.

92.    Relator Wilkerson resisted Boggus' and other Shoals Hospital staff's efforts to admit ineligible patients to the Shoals IPF.  Repeatedly, beginning in March 2019 and continuing through his retaliatory discharge in May 2020—Relator Wilkerson submitted approximately six internal Quality Assurance Reports regarding inappropriate admissions to the Shoals IPF or improper care decisions that were directly attributable to Shoals and LifePoint's consistent push of inappropriate Medicare patients from the emergency room and general inpatient unit to the more profitable IPF.

93.    These Quality Assurance Reports were the primary, internal, mechanism to report significant compliance and standard of care reports.  Indeed,

admitting elderly patients to lengthy hospital admissions when such care is not medically necessary often results in harmful outcomes for the patient. Dr. Wilkerson witnessed this dynamic first-hand.

94.    The LifePoint Defendants never addressed nor meaningfully followed-up with Relator Wilkerson related to his Quality Assurance Reports. When Relator Wilkerson did request updates on the submitted Quality Assurance Reports, asking what has been done to remedy the reported problems, he would simply be told "it got taken care of."

95.    In these Quality Assurance Reports and other internal grievances regarding Medicare fraud Relator Wilkerson cited the Shoals Hospital Senior Care Center's Admission Criteria and identified the ways in which Shoals Management was selectively disregarding its own mandatory admission criteria.

**B. Mandatory Admission Criteria for Shoals IPF Admission—Which LifePoint Defendants Violated**

96.    The Shoals Hospital Senior Care Center Admission Criteria provides, in part: "Admission criteria is applied uniformly to, both, Medicare and Non-Medicare patients." This provision is a Condition of Payment under the IPF PPS. *See* 42 C.F.R. 412.25; 42 C.F.R. 412.404. However, Shoals only aggressively pushed Medicare patients into the Shoals IPF to take advantage of the IPF PPS per-

diem payment while withholding admission from non-Medicare patients, often pushing these non-Medicare patients to the separate General Psych Unit.[4]

97.    Because Shoals IPF violates its own admission requirements to selectively admit profitable Medicare patients, the mandatory admission criteria are not applied uniformly. Therefore, all Shoals Hospital IPF PPS billings are false claims because Shoals Hospital is continuously violating a threshold condition of payment under the specialized IPF PPS per diem reimbursement structure. *See* 42 C.F.R. § 412.25; 42 C.F.R. § 412.404.

98.    More specifically, the Shoals Senior Center Admission Criteria provides, in part, the Exclusion Criteria that details when patients are inappropriate for admission to the IPF:

(i)    Patients with a substantiated diagnosis of dementia with no acute behavioral change or known psychiatric disorder and no expectation for positive response to treatment;

(ii)   Patients with life threatening acute medical or surgical illnesses will not be accepted;

(iii)  Patients with terminal diseases without a treatable psychiatric disorder will be referred to an appropriate hospice facility;

(iv)   Patients that are bedfast or otherwise cannot participate in the treatment program;

---

[4] Demonstrating the LifePoint Defendants focus on profit, not patient care, the Medical Director of the General Psychiatric Unit at Shoals Hospital (which had a patient population of primarily Medicaid or uninsured patients) was routinely criticized for keeping patients too long, regardless of whether patients needed continued inpatient psychiatric treatment. Riverbend Community Mental Health is a psychiatric physician practice that held this medical directorship.

(v)    Patients with complex medical/surgical procedures, preventing their participation in the active treatment program;

(vi)    Patients with a primary substance use disorder.

99.    Despite these clear guidelines, Shoals and LifePoint consistently sought to admit Medicare patients to the IPF that were clearly excluded from admission pursuant to Shoals' admission criteria and Medicare IPF admission criteria.

100.    For example, a common Medicare patient type that LifePoint would attempt to push to the Shoals IPF were patients in alcohol withdrawals – which violated the Shoals Exclusionary Criteria because the Patient had a primary condition of substance abuse disorder. Defendant LifePoint often sought to admit patients in severe alcohol withdrawal—a condition known as delirium tremens. Delirium tremens is a severe alcohol withdrawal condition and can be deadly. Accordingly, these patients had "a life-threatening acute medical illness" and should not have been admitted. Indeed, Dr. Wilkerson has knowledge that approximately 1/3 of patients in delirium tremens face a significant chance of death, and therefore patients in delirium tremens should be treated in the Intensive Care Unit. Yet, LifePoint sought to admit these medically unstable patients to the IPF despite Shoals IPF not being equipped to adequately care for substance abuse patients. In his role as Medical Director, Relator Wilkerson was constantly battling LifePoint over admissions of alcohol withdrawal and other substance abuse patients. Dr. Wilkerson

submitted internal Quality Assurance reports related to this direct issue—yet received no meaningful response.

101. Another common Medicare patient type that would be consistently pushed to Shoals IPF was late-stage Alzheimer's patients that could not benefit from active psychiatric treatment and were often bed-bound. These patients were in violation of Shoals and Medicare IPF admission regulations because they could not benefit from active treatment, were not admitted for purposes of psychiatric diagnosis and could not participate in therapy.

102. Relator Wilkerson recognized that LifePoint was simply exploiting the high-reimbursing per diem payment system by using the Shoals IPF as a holding facility for patients that were awaiting admission to a nursing home or other care setting.

103. In one example, Defendant LifePoint referred an elderly dementia patient to the Shoals IPF. Dr. Wilkerson evaluated this patient and determined that he did not have an acute behavioral change, was not suffering from known psychiatric disorder and had no expectation for positive response to treatment, therefore Dr. Wilkerson declined to admit the patient.

104. Thereafter, LifePoint—though a Case Manager Charlotte Rogers—consistently pushed Dr. Wilkerson to admit this patient, despite his assessment that IPF admission was not necessary and refusal to do so. Throughout the back-and-

forth discourse regarding this patient's admission, Dr. Wilkerson learned that the actual reason that LifePoint wanted to admit this patient was that the patient was awaiting disposition to a Medicaid funded nursing home; but Medicaid was conducting a review of the patient's assets to determine eligibility for Medicaid funded nursing care, thus delaying admission to the nursing home. Accordingly, LifePoint simply wanted to house this patient for an indefinite period until his Medicaid eligibility was determined—all paid for at the high-reimbursing, per diem, IPF billing rate. Because the patient was patently not-eligible for Medicare funded inpatient psychiatric care, Dr. Wilkerson refused admission, informing Charlotte that the patient "can sleep on the hospital floor just as well as in the [IPF]." LifePoint, specifically Bradley Boggus, was not pleased to hear this news because an indefinite-duration hospital admission for this patient would have likely been unprofitable because it would be billed on the discharge-based IPPS, not the per-diem IPF PPS.

105. In other instances, LifePoint would try to admit medically complex patients to the IPF, simply to take advantage of the IPF per-diem billings. For these medically complex patients, the shifting of care was especially troubling. For example, Dr. Wilkerson is aware of one patient that was admitted to the Shoals IPF, but upon further assessment, Dr. Wilkerson recognized that the patient was primarily suffering from pain caused by Metastatic Pineal Cancer. In fact, the patient had no

psychiatric issues whatsoever and was simply irritable due to extreme, unmanaged, pain. Therefore, the patient had no need for active treatment and no potential for improvement from inpatient psychiatric care and was thus ineligible for inpatient psychiatric treatment. Dr. Wilkerson attempted to transfer this patient back to the ER or ICU, yet could not get a consult with a pain-management physician in the medical unit of Shoals Hospital due to the institutional structure put in place by LifePoint to funnel patients to the IPF. However, after an inappropriate and non-billable episode in the Shoals IPF, the Patient was discharged to hospice care. Nevertheless, the LifePoint Defendants billed Medicare for this inappropriate and non-billable IPF admission.

### C. Defendant LifePoint and Shoals Hospital's Admission of Intent to Violate the Anti-Kickback Statute and Provision of Illegal Remuneration.

106. Because of his objective clinical judgment and opposition to LifePoint's efforts to admit and retain ineligible patients in the Shoals IPF, Dr. Wilkerson was consistently at odds with LifePoint management, most often COO/CFO Bradley Boggus. In or around August 2019, Dr. Wilkerson refused to admit an inappropriate substance abuse patient to the Shoals IPF and Dr. Wilkerson was called to Bradley Boggus' office to discuss what Boggus felt was inadequate admissions to the Shoals IPF. In this meeting, Boggus—who is not clinically trained—continued to assert that Dr. Wilkerson should admit more Medicare

patients and keep patients longer. Boggus provided no medical justification for his demands. Relator Wilkerson remained steadfast that he would admit only eligible patients to the Shoals IPF and keep patients only as long as medically necessary. To this, Boggus informed Relator Wilkerson that he was unhappy with Wilkerson's admission rates, demanded IPF admissions increase and exclaimed: **"I'm paying you to admit patients!"**

107.   Relator Wilkerson was shocked and dismayed by Boggus' statement. Relator Wilkerson reasonably understood Boggus' directives and statement to mean Boggus viewed the Medical Directorship contract with Serenus, and corresponding Medical Director payments and billing rights as *quid pro quo* remuneration for Wilkerson and Serenus to aggressively admit and retain patients to the Shoals IPF.

108.   Boggus' proclamation made clear that the disagreements over IPF admissions and length of stay were not based upon any disagreement of medical opinion nor optimal treatment. Instead, LifePoint's motivation for admission was solely monetary, and LifePoint operated by paying IPF Medical Directors to admit patients.

109.   Faced with LifePoint's statement that it viewed the IPF Medical Director contract as a *quid pro quo* payment for admissions – and therefore clearly in violation of the Anti-Kickback Statute, Relator Wilkerson determined he could

no longer legally serve as Medical Director pursuant to a kickback-tainted arrangement and submitted his written resignation to Boggus on August 21, 2019.

110. Upon receipt of Dr. Wilkerson's resignation, Boggus apparently recognized the error of admitting he was violating the Anti-Kickback Statute by "paying [Dr. Wilkerson] to admit patients."   Soon after, Boggus called Dr. Wilkerson back to his office and apologized for his behavior and promised that he would allow Dr. Wilkerson unfettered authority to exercise medical judgment over admission and length of stay decisions if he agreed to remain Medical Director.

111. With such assurances, Dr. Wilkerson agreed to remain Medical Director of the Shoals IPF.

112. Nevertheless, his tenure would prove to be short-lived and he would be replaced by a physician willing to accept LifePoint's illegal arrangement of payment for admissions.

### D. The LifePoint Defendants' Retaliation Against Relator Wilkerson in Violation of 31 U.S.C. 3730(h).

113. Despite Mr. Boggus' assurances that Dr. Wilkerson would hold unfettered discretion over clinical decisions of admission and length of stay in the Shoals IPF, Boggus continued to interfere with Dr. Wilkerson's medical decision making and pushed Dr. Wilkerson to admit and retain patients in the Shoals IPF. Further, Boggus kept the institutional structure that would alert him whenever a Medicare patient could remotely be a candidate for IPF admission.

114.   Boggus also refused to allow Dr. Wilkerson authority to hire appropriate staff to ensure that the Shoals IPF could even provide required "active treatment" for Shoals IPF patients.

115.   On May 20, 2020, Serenus and Dr. Wilkerson were informed that the medical directorship contract would be terminated within seven days.  In doing so, LifePoint violated Serenus' Medical Directorship contract in several material ways—including by immediately terminating the Contract without 120 days' notice. Serenus was owed $50,000.

116.   LifePoint refused to pay Serenus the $50,000 early termination fee. More shocking, LifePoint cited its perceived losses regarding "census, length of stay and admission" during Serenus' tenure as Medical Director of the Shoals IPF as justification for refusing to pay the contractual early termination fee.  In response, Serenus informed LifePoint that its position to terminate and penalize Serenus because of perceived concerns with "census, length of stay and lost patient days" was in violation of the federal Anti-Kickback Statute.

117.   Therefore, it is clear that Serenus's and Relator Wilkerson's termination as Medical Director of the Shoals IPF, and attendant contractual damages, was in retaliation for Relator Wilkerson's efforts to prevent false claims from being submitted based on his opposition to LifePoint's consistent push for inappropriate IPF admissions and unnecessary lengths of stay.

### E. The Yalamanchili Defendants Become Medical Director of Shoals IPF and Submit and Cause the Submission of False Claims.

118.   Shortly prior to Dr. Wilkerson's final day as Medical Director of the Shoals IPF, Dr. Wilkerson learned that Defendant Yalamanchili, and his physician practices (River Region Psychiatry and Alabama Psychiatry), would be the new medical director over the Shoals IPF.

119.   Specifically, Dr. Wilkerson learned from Shoals Hospital IPF Program Manager and Social Worker Kyle Smith that Defendant Yalamanchili had initiated contact with LifePoint management and offered his services as medical director of the Shoals IPF.   Upon hearing Defendant Yalamanchili's sales pitch, LifePoint Management immediately terminated Serenus as medical director and hired the Yalamanchili Defendants.

120.   Despite no longer being the Medical Director of the Shoals IPF, Dr. Wilkerson continues to treat psychiatric patients in the Florence/Muscle Shoals, AL area at Serenus' outpatient psychiatric clinic and continues to have admitting privileges to Shoals Hospital and North Alabama Medical Center.

121.   Therefore, Dr. Wilkerson treats patients that were admitted to the Shoals IPF under Dr. Yalamanchili's Medical Directorship and has knowledge of these patients' psychiatric condition (or lack thereof), admission, treatment and discharge from the Shoals IPF.

122.   Through this knowledge and experience caring for these patients, Dr. Wilkerson has knowledge that Dr. Yalamanchili has agreed to actively participate in LifePoint's stated scheme to "pay [the Shoals IPF Medical Director] to admit patients."

123.   Relator Wilkerson has also witnessed that Dr. Yalamanchili and LifePoint submit and cause the submission of false claims for patients that are inappropriate for inpatient psychiatric care under Medicare guidelines and the Shoals IPFs written admission criteria.   These violations cause the Shoals IPF to not be eligible for exclusion from the general IPPS billing structure—thus causing all IPF PPS bills to be false claims.   42 C.F.R. § 412.25.

124.   Moreover, Dr. Wilkerson has knowledge that Defendant Yalamanchili does not provide the requisite active treatment required for IPF PPS services, and does not see patients in person but performs all Medical Director functions remotely. Employees of the Shoals IPF, including RN Jill Boatright, have informed Dr. Wilkerson that Dr. Yalamanchili sees patients, via video-conference for one to two minutes and claims to have done a full psychiatric evaluation.   Further, these Shoals IPF employees have made comments to Dr. Wilkerson that, under Dr. Yalamanchili's regime, the Shoals IPF operates more as a nursing home than an inpatient psychiatric unit.

125. Therefore, patients admitted to Shoals IPF under Defendant Yalamanchili do not receive the required services that are mandated to be provided when billing under the IPF system. Medicare Benefit Policy Manual Ch. 2 Inpatient Psychiatric Hospital Services §§ 30.2.2, 30.2.2.1. At best, these patients are being provided standard care that should be provided in Shoals Hospital medical unit not inpatient psychiatric unit and billed under the DRG-based IPPS. Thus, the LifePoint and Yalamanchili Defendants are fraudulently "up-coding" standard care when billing it as inpatient psychiatric care under the per-diem IPF PPS.

126. Another troubling aspect of the Yalamanchili regime is that the LifePoint Defendants and Yalamanchili have knowingly admitted COVID-19 patients to the Shoals IPF and submitted IPF per diem psychiatric billings for these patients. Therefore, because these COVID-19 patients must be kept in isolation, it is impossible that group therapy or other psychiatric therapeutic activity could have been performed. Thus, Defendants' IPF billings for COVID-19 patients are false because no active treatment was provided.

127. The census of the Shoals IPF skyrocketed immediately after Dr. Yalamanchili took over the Shoals IPF Medical Directorship on May 28, 2020. Under Dr. Wilkerson's Medical Directorship of striving to admit only eligible patients—who actually required and could benefit from active inpatient psychiatric

treatment—the average census of the Shoals IPF was approximately seven patients admitted at one time.

128.   Specifically, on May 27, 2020, under Dr. Wilkerson, the Shoals IPF had approximately five patients admitted. Within one week, the census jumped to 19 patients upon Dr. Yalamanchili becoming Medical Director.  During this one week time-period, there was no change in patient population or psychiatric needs of the community.   The Shoals IPF census has remained much higher under Dr. Yalamanchili, typically between 15-20 patients.  Specifically, as of August 24, 2020 there were 15 patients admitted.

129.   Similarly, the average length of stay under Dr. Yalamanchili has increased dramatically to approximately 14 days—which is significantly longer than the 7-day average length of stay under Dr. Wilkerson—and coincides with LifePoint's mandates.

130.   Based upon his personal experience treating these patients, Relator Wilkerson is aware of the following patients who—in exchange for illegal remuneration—were improperly admitted to the Shoals IPF for treatment by Defendants Dr. Yalamanchili, River Region, and Alabama Psychiatry, and whose care was improperly billed to Medicare via CMS Form 1500 by the LifePoint Defendants:

> a. Patient A, an 81-year-old Medicare beneficiary, was admitted to the Shoals IPF for 16 days from August 13, 2020 until August 29, 2020.

Dr. Yalamanchili's admission examination was recorded as having been performed via telemedicine, and contained patently false assessment documentation because the exam purportedly included a cranial nerve examination—which is incapable of being performed remotely.[5] At admission, Patient A was not eligible for admission to the Shoals IPF because Patient A had no acute behavioral change and no expectation for positive response to active psychiatric treatment. Further, all IPF PPS billing for Patient A's care was false because Patient A was not actively involved in any group psychotherapy—which is a part of active treatment under Medicare guidelines. Moreover, the record did not provide any justification for the recertification of IPF treatment and length of Patient A's stay at the Shoals IPF—despite being admitted over 12 days and thus requiring a recertification. In fact, on August 19, 2020, after six days in the Shoals IPF, Patient A's family requested his discharge. Yet, this patient was inexplicably held against his and his family's will for another 10 days of *per diem* billing. Only when Patient A's spouse threatened to contact an attorney regarding this false imprisonment and Patient A's family visited the Shoals IPF on August 28, 2020 demanding Patient A's discharge, did Dr. Yalamanchili ultimately agreed to discharge Patient A on August 29, 2020. Demonstrating the patient harm stemming from Yalamanchili's troubling retention of patients is the deterioration of Patient A's condition while admitted to the Shoals IPF. On October 7, 2020, Relator Wilkerson examined Patient A and learned that Patient A had developed bed sores while admitted to the Shoals IPF and that his mobility had significantly declined while there. Patient A's medical record from the Senior Care Center also contained an Occupational Therapy Assistant's note on August 25, 2020 observing a decline in Patient A's motor skills, as well as a report on August 26, 2020 that Patient A described himself as growing weaker since being hospitalized.

---

[5] As addressed *supra*, these patently false billing records are examples of Dr. Yalamanchili's scheme to submit up-coded and false claims for professional fee services. Relator Boodoo has knowledge that cranial nerve examinations and other false documentation in the descriptions of Patients A-C are items that are included in the Yalamanchili Defendants' fraudulent billing templates. Therefore, these patients are representative of the scheme to up-code professional fee services alleged herein.

b. Patient B, a 73-year-old Medicare beneficiary with pre-existing dementia, was admitted to the Shoals IPF for 13 days from November 4, 2020 until November 17, 2020. Dr. Yalamanchili's admission examination was recorded as having been performed via telemedicine, and contained patently false assessment documentation because the exam purportedly included several assessments which cannot be accomplished remotely, including pupillary reaction to light, visual acuity, facial sensation, hearing, oral cavity inspection, and cranial nerve muscle strength. Upon admission, Patient B was not eligible for admission to the Shoals IPF because Patient B had no known psychiatric disorder and no expectation for positive response to active psychiatric treatment but admission documentation merely listed the generic term "Psych" as her chief complaint. In actuality, Patient B was a patient that was suffering from life-threatening acute medical issues—specifically dehydration with resulting delirium, and acute renal failure. However, once admitted to Shoals IPF, Patient B's dehydration status went unmonitored. Monitoring a patient's hydration status is a fundamental tenet of inpatient hospital care—particularly with a patient suffering from dehydration. Instead, Shoals IPF administered anti-psychotic medication, which would increase her risk of neuroleptic malignant syndrome, syncope, falls, and fractures. Patient B's medical record also did not provide any reason for the length of her stay at the Senior Care Center. Additionally, Shoals IPF did not perform adequate active treatment which would have potentially improved the underlying conditions leading to Patient B's hospital admission. Specifically, upon admission, Patient B was unwashed with severely deficient personal hygiene, as well as being dehydrated. Nevertheless, Dr. Yalamanchili noted Patient B's "good" social support system. Patient B's family was not contacted until the day prior to her discharge. In fact, Patient B's family was not counseled regarding her poor hygiene, fluid and nutritional requirements, or bowel and bladder needs or that Patient B was discharged to a capable home environment. At minimum, such counseling would have been fundamental, if active psychiatric treatment was actually performed during this admission.

c. Patient C, an 80-year-old female and Medicare beneficiary, was admitted to the Shoals IPF for treatment for 21 days from October 6, 2020 until October 27, 2020. Her chart reflected that she was

being treated for dementia when admitted, and listed the generic term "Psychiatric evaluation" as her chief complaint. As an initial matter, why Patient C was kept in a psychiatric unit for 21 days of "evaluation" is inexplicable and demonstrates the pure profit focus of Defendants. Dr. Yalamanchili's admission examination was recorded as having been performed via telemedicine and contained patently false assessment documentation because it documented a cranial nerve examination, which is incapable of being performed remotely. At admission, Patient A was not eligible for admission to the Shoals IPF because Patient A had no acute behavioral change nor any known psychiatric disorder and no expectation for positive response to active psychiatric treatment. Instead, the wholly unnecessary and excessively lengthy IPF admission worsened Patient C's condition. Shortly after Patient C's admission to the Senior Care Center, she fell, suffering a contusion on her head and complaining of back and hip pain. Further, on October 17, 2020, she was found to have bilateral heel ulcers, which were not present at the time of admission, and strongly suggest that she was not being appropriately repositioned while at the Senior Care Center. Patient C's progress notes characterized her as pleasant, cooperative, and sleeping well. Patient C primarily received medication management and routine nursing care while at the Senior Care Center. Due to her dementia, Patient C was unable to participate in any individual or group therapy. Accordingly, the care provided to Patient C was custodial care that should have been provided at an assisted living facility or the medical unit of Shoals Hospital, and billed under the general IPPS and not active psychiatric treatment billed under the IPF PPS. Overall, it is clear Patient C's condition did not necessitate specialized hospital services in a geropsychiatry unit, and that the duration of her hospitalization was grossly excessive, without any basis and only served to aggravate her physical health.

## II.    Relator Boodoo's Knowledge of the Prime and Yalamanchili Defendants' False Claims.

131. On June 8, 2018, Relator Dr. Ramnarine Boodoo, MD, a licensed

psychiatrist, was hired by Defendant Dr. Yalamanchili—through Yalamanchili's

entities River Region and Alabama Psychiatry—to provide psychiatric services at Riverview Regional, a hospital in Gadsden, Alabama owned and operated by the Prime Defendants.

132.  In his role, Relator Boodoo was the listed attending physician for patients admitted to the Riverview IPF and was therefore responsible under Medicare requirements to monitor and evaluate the quality and appropriateness of services and treatment provided by the medical staff.  Medicare Benefit Policy Manual Ch. 2 §40.1. Further, Dr. Boodoo was responsible for certifying that inpatient psychiatric facility admission was medically necessary for patients. Medicare Benefit Policy Manual Ch. 2 § 30.2.1; Medicare Benefit Policy Manual Ch. 4 § 10.9.

133.  Like Defendant Yalamanchili's Medical Directorship at Shoals Hospital, the Prime Defendants paid Alabama Psychiatry as independent contractors to provide Medical Director services to the Riverview IPF.  In this arrangement, Alabama Psychiatry, as an entity, held the Medical Director contract and supplied its physicians, such as Relator Boodoo, to Riverview to administer Medical Director services.  Under this arrangement, the Yalamanchili Defendants were paid a set amount for providing physicians and retained billing rights for the professional fee services provided by Alabama Psychiatry providers at Riverview.

134.   Relator Boodoo has knowledge that the Yalamanchili Defendants fraudulently up-code the professional fee services, billed under Medicare Part B. Relator Boodoo personally witnessed Dr. Yalamanchili perform professional fee services, which amount to Dr. Yalamanchili being seated at a nursing station and the patient being wheeled to him, at which point Dr. Yalamanchili would ask "Hi, how are you doing, do you know why you are here?"  Regardless of the patients' answer, or lack of answer, Dr. Yalamanchili would thereafter use templates that encouraged fraudulently billing Medicare for the highest level of "Subsequent Hospital Visit" under CPT code 99233—a code completely incompatible with the service performed.   Furthermore, the Yalamanchili Defendants attempted to coerce Dr. Boodoo into up-coding professional fee services by requiring the use of inapplicable billing templates that would encourage and steer the physician bill CPT code 99233—despite the patient not exhibiting symptoms that would justify such a high billing.

## A. Defendant Prime Intentionally Seeks to Influence Physician Medical Judgment and Cause False Claims.

135.   Dr. Boodoo has knowledge that Prime—like LifePoint—simply wanted its IPF Medical Director to admit and retain patients to maximize its billing under the profitable IPF PPS Medicare billing structure.   Further, Prime intentionally offered and paid its contractual payments and billing rights to the Yalamanchili Defendants to induce the admission and retention of patients to the Riverview IPF.

136. At Riverview, Dr. Boodoo made objective and reasonable clinical decisions regarding patient admissions and length of stay. However, Dr. Boodoo's objective clinical judgment soon came under scrutiny from administrative employees of Riverview—most often Vivian Lee and Patricia Ballard[6], who served as Director of the Psychiatric Ward at Riverview, and John Langlois, Chief Executive Officer of Riverview.

137. Ms. Lee and Mr. Langlois consistently demanded that Dr. Boodoo admit Medicare patients to the Riverview IPF regardless of medical necessity and retain patients for specific lengths of stay.

138. Further, Ms. Lee instructed Dr. Boodoo that his admission and length of stay decisions should be dictated by patient insurance coverage—and corresponding profit for Prime—instead of medical necessity. Specifically, Ms. Lee and Ms. Ballard instructed Dr. Boodoo that Medicare patients should be admitted, even if they did not require inpatient psychiatric treatment but Medicaid or uninsured patients should not be admitted, even if they did require inpatient psychiatric treatment. This selective "cherry-picking" of profitable Medicare patients is precisely the scheme that Medicare intended to deter by requiring IPFs to have

---

[6] Patricia Ballard replaced Vivian Lee as the Riverview IPF unit manager during the summer of 2019 and similarly executed Langlois' mandates to admit Medicare patients to the Riverview IPF.

"written admission criteria that are uniformly to both Medicare and non-Medicare patients." 42 C.F.R. 412.25.

139.    A troubling example of this mandate was on November 1, 2019, Relator Boodoo was seeking to admit a patient that was dangerous and actually needed inpatient psychiatric care but was not insured by Medicare.  Relator pleaded with Riverview IPF unit manager Patricia Ballard to admit the clearly eligible and dangerous patient, yet Ms. Ballard coldly relayed the message: "Administration said no."

140.    Relator Boodoo, responded "Ok, but I told [Riverview ER Physician] Dr. Karol he needs to be admitted."

141.    Emphasizing that the Riverview administration, i.e. CEO Langlois, truly made the admission decisions at Riverview, Ms. Ballard simply re-stated: "Admin said no."

142.    Both Ms. Lee and Ms. Ballard made clear to Dr. Boodoo that CEO John Langlois held the ultimate authority regarding psychiatric admission decisions and length of stay.  Dr. Boodoo learned this information because each week Ms. Lee— who was the *de facto* "utilization review committee" for Riverview IPF—would meet with Mr. Langlois in some purported formulation of a utilization review committee and return with directives from Mr. Langlois, stating: "John says we need to keep patients longer."

143.   Mr. Langlois is not clinically trained and provided no medical justification for the demands for Dr. Boodoo to increase admissions and length of stay.

144.   Instead, these demands were solely motivated by the Prime Defendants' desire to maximize profitable IPF PPS billing.

145.   Specifically, in late 2018, Ms. Lee instructed Dr. Boodoo to increase the length of stay of the Riverview IPF, regardless of clinical necessity.  To this, Relator Boodoo responded that he "would make patient care decisions based on clinical necessity and would not extend the lengths of stay just because the hospital wanted to make money or because [CEO] John [Langlois] said so."

146.   Later, in January 2019, CEO John Langlois, in a discussion with Relator Boodoo and Ms. Lee outside of the Etowah County Courthouse, sternly informed Relator Boodoo that "his length of stay was too short."  Langlois informed Relator Boodoo that his length of stay was approximately five days and that Riverview wanted the average length of stay to be 15 days.

147.   Relator Boodoo responded that he would only keep patients as long as medically necessary and that retaining patients longer than medically necessary was in violation of Medicare conditions of payment as well as an unlawful infringement on patients' basic liberty.

148.   Confronted with Dr. Boodoo's continued opposition to Riverview's solely profit focused admission and length of stay directives, Mr. Langlois demanded that Relator Boodoo increase IPF patients' length of stay by any means necessary.  Langlois also forewarned that if Relator Boodoo continued to refuse to retain patients to an average length of stay of 15 days—regardless of medical necessity—he would report Relator Boodoo's refusal to Relator Boodoo's supervisor, Defendant Yalamanchili.

149.   Dr. Boodoo responded, "you do what you have to do, John, and I'll do what I have to do."

150.   Relator Boodoo remained steadfast and within one week of this January 2019 discussion on the Etowah County Courthouse steps, Relator Boodoo's refusal to adhere to profit-based, non-clinical, length of stay mandates was reported to Defendant Yalamanchili.

151.   Upon learning that Relator Boodoo—an attending physician charged with caring for patients and certifying the necessity of care to Medicare—refused to bend to the mandate of Langlois, who lacked the ability or training to make such medical judgments, Defendant Yalamanchili sided with Mr. Langlois' and began inserting himself into Dr. Boodoo's care decisions.  Specifically, Dr. Yalamanchili called Dr. Boodoo and said: "I hear the hospital wants to keep these patients longer, so we need to keep them longer."

152.   After this conversation, Defendant Yalamanchili required Dr. Boodoo to seek Yalamanchili's approval to discharge a patient, the day prior to discharge. Defendant Yalamanchili utilized this institutional hurdle to purposely delay discharges—even when patients and their families were demanding discharge from the Riverview IPF.

153.   Often, Defendant Yalamanchili would be unresponsive to attempts to get his approval for discharge, thereby delaying discharge and extending per diem billings. Even when Dr. Boodoo was able to discuss patient discharges with Dr. Yalamanchili, Dr. Yalamanchili would have no knowledge of the patients' condition, had not reviewed medical records related to the patient, and would have to be fully informed of the patients' condition by Dr. Boodoo—the attending physician.

154.   Then, Dr. Yalamanchili would nevertheless propose inane reasons to retain the patient, even though he had no knowledge of the patient's medical condition.

155.   For example, on September 23, 2019, Dr. Boodoo tried to discharge a patient who could not benefit from active psychiatric treatment, had a stable discharge destination, and whose family was demanding discharge. Without any explanation or knowledge of the patient, Dr. Yalamanchili proposed that the patient should be retained longer because the patient was "impulsive."

156.   Accordingly, Defendant Yalamanchili's insertion into Dr. Boodoo's medical decision making was simply executing Langlois' and the Prime Defendants profit-motivated retention of patients.

157.   Dr. Boodoo has knowledge that Defendant Yalamanchili adhered to Prime's mandates to retain and admit patients regardless of medical necessity because he was concerned about losing the lucrative Medical Directorship contract at Riverview.

158.   In September 2019, Langlois was frustrated that Dr. Boodoo was not retaining patients for his desired length of stay and had a meeting with Defendant Yalamanchili to discuss the issue.   In this meeting Langlois informed Defendant Yalamanchili that the Riverview IPF Medical Directorship would be "up for grabs" if Defendant Yalamanchili could not get Dr. Boodoo to retain patients longer.

159.   Faced with potentially losing the lucrative medical directorship and corresponding illegal remuneration, Defendant Yalamanchili increased his pressure on Dr. Boodoo to fraudulently increase patient's length of stay.   When it became apparent that Dr. Boodoo would not participate in Yalamanchili and Prime's fraud, Yalamanchili terminated Dr. Boodoo as soon as he found a replacement that would artificially, and fraudulently manipulate care decisions in order to keep the lucrative contract.

**B.  Riverview Violation of IPF Admission Criteria Requirements.**

160.   The Riverview IPF is falsely classified as a Medicare IPF because Riverview does not utilize any written admission criteria.  *See* 42 C.F.R. 412.25. Therefore, all claims submitted by Riverview under the IPF PPS billing system are false because Riverview and the Prime Defendants have knowingly violated a threshold condition of payment to submit IPF PPS claims to Medicare. *Id.*

161.   During his tenure at the Riverview IPF, Dr. Boodoo recognized that the Yalamanchili Defendants purposely do not use written admission criteria so patients can be admitted at will, without having to even consider any uniform set of standards that could impede profits.

162.   In or around March 2019, Dr. Boodoo was approached by Riverview IPF nurse Tammy Zvodar who voiced her concerns about the inappropriate admissions to the Riverview IPF.  Ms. Zvodar informed Dr. Boodoo that she believed that inappropriate patients were being admitted to the Riverview IPF and presented a document that she described as the "old admission criteria."  Ms. Zvodar explained that the "old admission criteria" document was used when the prior Medical Director, Dr. Huma Khusro, oversaw the Riverview IPF, but that its use was discontinued when the Yalamanchili Defendants took over the Medical Directorship.

163.   Dr. Boodoo commiserated with Ms. Zvodar and acknowledged that he too felt Riverview IPF was admitting inappropriate patients and keeping patients too long.  Dr. Boodoo informed Ms. Zvodar that he wanted to remedy the situation and was constantly battling CEO Langlois and Dr. Yalamanchili over the issue.

164.   Upon reviewing the "old criteria,[7]" Dr. Boodoo recognized that Riverview habitually admitted Medicare patients in violation of this written criteria as well as refused to admit non-Medicare patients that qualified under these criteria.

165.   Dr. Boodoo had numerous subsequent conversations with Defendant Yalamanchili, CEO Langlois, and Patricia Ballard regarding inappropriate admissions and lengths of stay.  In these conversations, Dr. Boodoo reiterated the need for a standardized admission criteria, that would be applied consistently, regardless of payor source.

## C. Specific Examples of False Claims Submitted and Caused to Be Submitted by the Yalamanchili Defendants and Prime Defendants.

166.   Relator Boodoo has witnessed numerous instances in which the Prime Defendants and Yalamanchili Defendants falsely billed Medicare.  The following patients are representative examples of false claims submitted.  For each of these

---

[7] The "old criteria" required that a patient meet one of the following criteria in order to appropriate for admission to the Shoals IPF: Recent (within 72 hours) attempted suicide; Documentation of suicidal ideation requiring suicide precautions; assaultive behavior as a result of psychiatric disorder; Documentation of self-mutilation behavior as a result of psychiatric disorder; or Passive suicidal ideation, risk for harm due to feeling of helplessness/hopelessness.  Many of the patients admitted to Riverview IPF—in exchange for illegal remuneration—patently did not meet this criteria.

representative examples, the claims are false because (1) the Riverview IPF was falsely operating as an IPF because it did not utilize written admission criteria and did not apply written admission criteria uniformly to both Medicare and non-Medicare patients; (2) the patients' admission to inpatient psychiatric care was not reasonable and necessary; (3) required "active treatment" was not provided to these patients, in violation of Medicare conditions of payment; and (4) billings for the patient care was tainted by kickbacks.

- Patient D was an 81-year-old Medicare patient who was admitted to the Riverview IPF on October 4, 2019. Riverview IPF did not utilize written admission criteria at this time. Upon admission, Patient D stated that he had no suicidal, homicidal, or assaultive ideations or feelings. He denied having auditory or visual hallucinations. Patient D in fact stated, "I'm not crazy, I shouldn't be here." He understood that he had been transferred to psychiatry from the medical ward after being treated for a low potassium level. Patient D spent ten days in the Riverview IPF and exhibited no acute psychiatric symptoms throughout this IPF admission. While admitted to the Riverview IPF, Patient D did not receive active psychiatric treatment, therefore this admission and services rendered were not legally billable services under the IPF PPS.

- Patient E is an 83-year-old Medicare patient who was admitted to the Riverview geriatric psychiatric unit on April 29, 2019, after three days of treatment in the medical ward for an electrolyte imbalance. Riverview IPF did not utilize written admission criteria at this time. Upon admission, Patient E stated that she had no suicidal, homicidal, or assaultive ideations or feelings. Patient E spent ten days in the Riverview IPF and exhibited no acute psychiatric symptoms throughout this IPF admission. There was no reason for a psychiatric admission. While admitted to the Riverview IPF, Patient E did not receive active psychiatric treatment, therefore this admission and services rendered were not legally billable services under the IPF PPS.

- Patient F is a 69-year-old Medicare patient who was admitted to the Riverview geriatric psychiatric unit on March 12, 2019. Riverview IPF did not utilize written admission criteria at this time. Upon admission, it was documented that Patient F was brought in by her daughter, "because she appeared to be having racing thoughts for one day." The psychiatric evaluation also states that she had no suicidal, homicidal, or assaultive ideations or feelings. She denied having auditory or visual hallucinations. Patient F spent three days in the Riverview geriatric psychiatric unit, and exhibited no acute psychiatric symptoms while there. There was no reason for a psychiatric admission. While admitted to the Riverview IPF, Patient E did not receive active psychiatric treatment, but merely custodial care, therefore this admission and services rendered were not legally billable services under the IPF PPS.

167.  The Prime Defendants submitted and continue to submit false IPF PPS claims to Medicare for these specific patients and many others during Defendant Yalamanchili's Medical Directorship, including throughout 2018 and 2019. Specifically, Defendant Riverview submitted false claims throughout 2018, and received IPF PPS interim payments of $2,976,300. Then, in early 2019, Defendant Riverview submitted a year-end CMS Cost Report Form 2552-10 for all IPF PPS claims in 2018. The 2018 year-end Cost Report Form 2552-10 claimed a net Federal IPF PPS payment of $2,514,118 and an additional $801,588 in Net IPF PPS Outlier payments for a total of $3,315,706. After deductible, coinsurance and sequestration adjustments, Medicare paid $2,976,306 in IPF PPS false claims to Defendant Riverview in 2018.

168.  Similarly, Defendant Riverview submitted claims throughout 2019, and received IPF PPS interim payments of $1,768,753. Then, in early 2020, Defendant

Riverview submitted a year-end CMS Cost Report Form 2552-10 for all IPF PPS claims in 2019. The 2019 year-end Cost Report Form 2552-10 claimed a net Federal IPF PPS payment of $1,979,657 and an additional $121,089 in Net IPF PPS Outlier payments. After deductible, coinsurance and sequestration adjustments, Medicare paid $1,775,690 in IPF PPS false claims to Defendant Riverview in 2018.

169.    In 2019, when Relator Boodoo was the attending physician and striving to limit Defendant Riverview's false claims throughout the year, the Riverview IPF submitted roughly 60% of the total IPF billings, and only 15% of the outlier billings than it did in 2018—when Relator Boodoo was only employed at Riverview for roughly half of the 2018 year.

## D. The Yalamanchili Defendants' Retaliation Against Relator Boodoo in Violation of 31 U.S.C. 3730(h)

170.    Throughout his employment with Alabama Psychiatry, Relator Boodoo sought to prevent false claims from being submitted by Defendant Prime and Riverview. Relator Boodoo sought to prevent false claims from being submitted by resisting Riverview CEO John Langlois' instructions to arbitrarily keep patients in the Riverview IPF for an average of 15 days.

171.    As described above, Relator Boodoo's efforts sought to prevent Riverview from submitting false claims to Medicare for medically unnecessary IPF services.

172.    Further, Relator Boodoo attempted to prevent false claims from being submitted by encouraging Riverview to apply a standardized admission criteria uniformly to Medicare and non-Medicare patients.  These efforts sought to prevent Riverview from submitting false claims under the IPF PPS because, without written admission criteria that were applied uniformly, Riverview violated a fundamental tenet of IPF billing.

173.    Relator Boodoo also sought to prevent false claims from being submitted by refusing to use Dr. Yalamanchili's fraudulent professional fee services billing template—which would have caused the submission of up-coded professional fee services.

174.    As a result of Relator Boodoo's efforts to prevent false claims from being submitted, and Langlois' threats to Yalamanchili that the Medical Directorship depended on Dr. Boodoo's fraudulently increasing admissions, Defendant Yalamanchili and Defendant Alabama Psychiatry retaliated against Relator Boodoo. On September 23, 2019, Dr. Yalamanchili sent Relator Boodoo a threatening email that stated "[i]t was brought to my attention that there have been multiple issues surrounding complaints from referral sources and concerns about premature discharge of patients at the hospital."  Defendant Yalamanchili did not provide any actual medical review of patient records nor provide any medical justification why Dr. Boodoo's discharges were purportedly "premature."  Therefore, this letter

merely confirms that Dr. Yalamanchili—in exchange for illegal remuneration in the form of the Medical Directorship contract—enforced CEO Langlois' arbitrary and unreasonable average length of stay target.  The letter went on to threaten that, if Dr. Boodoo did not abide by Yalamanchili's (and Langlois') mandates, "legal action will be sought due to breach of your employment contract."

175.   Soon after, via text message on September 25, 2019, Dr. Boodoo responded to Defendant Yalamanchili's continued enforcement of Langlois' length of stay mandate by stating: "that would be illegal. And I'm not breaking the law for Prime Healthcare or Alabama Psychiatry."

176.   Dr. Boodoo further informed Defendant Yalamanchili: "I will not conspire with you to commit a crime."

177.   To this Defendant Yalamanchili threatened that if Dr. Boodoo did not agree to Yalamanchili's plan to arbitrarily increase patients' length of stay, that Dr. Boodoo would be "in breach of employment."

178.   Dr. Boodoo astutely responded that such employment related threats "do not apply in cases of criminal action" and stated "I cannot believe what I'm hearing.  My employer, Dr. Shankar Yalamanchili is directing me to break the law and violate patients' rights just to satisfy a corporation.  Corrupt and cruel. Not right."

179.   Thereafter, Dr. Boodoo continued to resist the Yalamanchili Defendants' and Prime Defendants' continued submission of false claims.

180.   Dr. Boodoo was terminated on December 19, 2019 in retaliation for his efforts to prevent false claims form being submitted.   Specifically, Defendant Yalamanchili hired Dr. Eddie L. Huggins to replace Dr. Boodoo because Dr. Huggins did not seek to prevent false claims but instead complied with whatever instructions were provided by Yalamanchili and Prime.

181.   Dr. Boodoo has knowledge of Dr. Huggins blind adherence because Nurse Practitioner Shelley Padgett informed Relator Boodoo that Dr. Yalamanchili "instructed [Dr. Huggins] to do nothing but sign."

182.   "Nothing but sign" was all that all of the Defendants in this case sought from both Dr. Wilkerson and Dr. Boodoo all along.   Physician medical review for in-patient geriatric psychiatry services at the Defendants' facilities was and is a sham.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS AGAINST LIFEPOINT DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C § 3729(a)(1)(A)

183.   Relators adopt and incorporate paragraphs 1-14; 18-130 and 182 as though fully set forth herein.

184. By and through the fraudulent schemes described herein, Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Shoals Hospital Senior Care Center when the Shoals Senior Care Center was ineligible to bill under the Inpatient Psychiatric Facility Prospective Payment System because the Shoals Senior Care Center did not have written admission criteria applied uniformly to both Medicare and non-Medicare patients in violation of 42 C.F.R. § 412.25;

(b) Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Shoals Hospital Senior Care Center to the Medicare program that were unreasonable and not medically necessary because the patients did not qualify for or need inpatient psychiatric care in violation of 42 U.S.C. §1395y(a)(1)(A);

(c) Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Shoals Hospital Senior Care Center to the Medicare program because Defendants did not provide active psychiatric treatment that are required to bill Medicare under the Inpatient Psychiatric Facility Prospective Payment System.

185. Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili caused the submission of false or fraudulent claims for payment or approval by causing false certifications on forms required for

payment of claims under federal healthcare programs, including: Form CMS-1450, Form CMS-1500, Form CMS-2552-10, Form CMS-855I.

186.   The United States was unaware of the falsity or fraudulent nature of these claims described herein and paid claims it would not have paid but for the material misrepresentations submitted by Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili.

187.   Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to these Defendants by the United States through the Medicare program for such false and/or fraudulent claims.

WHEREFORE, Relators demand judgment in his favor on behalf of the United States and against Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT TWO
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS AGAINST PRIME DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C § 3729(a)(1)(A)

188.    Relators adopt and incorporate paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

189.    By and through the fraudulent schemes described herein, Defendants Prime Healthcare Services, Inc., Prime Healthcare Services--Gadsden, LLC and Riverview Regional Medical Center, LLC, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(d) Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Riverview IPF when the Riverview IPF was ineligible to bill under the Inpatient Psychiatric Facility Prospective Payment System because the Riverview IPF did not have written admission criteria applied uniformly to both Medicare and non-Medicare patients in violation of 42 C.F.R. § 412.25;

(e) Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Riverview IPF to the Medicare program that were unreasonable and not medically necessary because the patients did not qualify for or need inpatient psychiatric care in violation of 42 U.S.C. §1395y(a)(1)(A);

68

(f) Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for inpatient psychiatric services purportedly provided in Riverview IPF to the Medicare program because these Defendants did not provide active psychiatric treatment that are required to bill Medicare under the Inpatient Psychiatric Facility Prospective Payment System.

190.   Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili caused the submission of false or fraudulent claims for payment or approval by causing false certifications on forms required for payment of claims under federal healthcare programs, including: Form CMS-1450, Form CMS-1500, Form CMS-2552-10, Form CMS-855I.

191.   The United States was unaware of the falsity or fraudulent nature of these claims described herein and paid claims it would not have paid but for the material misrepresentations submitted by Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili.

192.   Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to these Defendants by the United States through the Medicare program for such false and/or fraudulent claims.

193.   WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

**COUNT THREE**
**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS**
**AGAINST YALAMANCHILI DEFENDANTS**
**31 U.S.C § 3729(a)(1)(A)**

194.   Relators adopt and incorporate paragraphs 1-182 as though fully set forth herein.

195.   By and through the fraudulent schemes described herein, Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – caused to be presented false or fraudulent claims to the United States for payment or approval, to wit: Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili submitted and caused to be submitted false claims for professional fee services that were "up-coded" because these Defendants falsely claimed payment for more extensive services than were actually performed.

196.   Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili caused the submission of false or fraudulent claims for payment or approval by causing false certifications on forms required for payment of claims under federal healthcare programs, including: Form CMS-1500 and Form CMS-855I.

197.   Many of these false claims were submitted by Alabama Psychiatry billing employee Erin Gottschalk.

198.   The United States was unaware of the falsity or fraudulent nature of these claims described herein and paid claims it would not have paid but for the material misrepresentations submitted by Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili.

199.   Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to these Defendants by the United States through the Medicare program for such false and/or fraudulent claims.

200.   WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants conduct, together with civil penalties as permitted by 31 U.S.C. § 3729,

attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT FOUR
## FEDERAL FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE AGAINST LIFEPOINT DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C § 3729(a)(1)(A); 42 U.S.C § 1320a-7b(b)

201. Relators adopt and incorporate paragraphs1-14; 18-130 and 182 as though fully set forth herein.

202. By and through the fraudulent schemes described herein, Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

203. By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of physician services and inpatient hospital care when such services were procured through illegal remuneration disguised as payment for medical director services.

204. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili caused, paid for claims that otherwise would not have been allowed.

205. Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States as a result of these Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT FIVE
## FEDERAL FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE AGAINST PRIME DEFENDANTS AND YALAMANCHILI DEFENDANTS

### 31 U.S.C § 3729(a)(1(A); 42 U.S.C § 1320a-7b(b)

206. Relators adopt and incorporate paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

207. By and through the fraudulent schemes described herein, Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information— presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

208. By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of physician services and inpatient hospital care when such services were procured through illegal remuneration disguised as payment for medical director services.

209. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili caused, paid for claims that otherwise would not have been allowed.

210. Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions have

resulted in damage to the United States equal to the amount paid by the United States as a result of these Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT SIX
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM AGAINST LIFEPOINT DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. § 3729(a)(1)(B)

211.  Relators adopt and incorporate paragraphs 1-14; 18-130 and 182 as though fully set forth herein.

212.  By and through the fraudulent schemes described herein, Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or statement material to a false or fraudulent claim or to get a

false or false claim paid or approved by the United States, to wit: these Defendants created or used false patient documentation, false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications, including those material certifications on Form CMS-1450, Form CMS-1500, Form CMS-2552-10, Form CMS-855I.

213. The false records or statements described herein were material to the false claims submitted or caused to be submitted, by Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili to the United States.

214. In reliance upon Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

215. Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal

to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT SEVEN
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM AGAINST PRIME DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. § 3729(a)(1)(B)

216.   Relators adopt and incorporate paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

217.   By and through the fraudulent schemes described herein, Defendants Prime Healthcare Services, Inc., Prime Healthcare Services--Gadsden, LLC and Riverview Regional Medical Center, LLC, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or statement material to a false or fraudulent claim or to get a false or false claim paid or approved by the United States, to wit: these Defendants created or used false patient documentation, false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications, including those material certifications on Form CMS-1450, Form CMS-1500, Form CMS-2552-10, Form CMS-855I.

218. The false records or statements described herein were material to the false claims submitted or caused to be submitted, by Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili to the United States.

219. In reliance upon Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

220. Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT EIGHT
## REVERSE FALSE CLAIMS AGAINST LIFEPOINT DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. §3729(a)(1)(G)

221.  Relators adopt and incorporate paragraphs 1-14; 18-130 and 182 as though fully set forth herein.

222.  By and through the fraudulent schemes describe herein, Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit: Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly submitted false claims to the United States and received funds based on false claims in violation of the FCA and Anti-Kickback Statute, yet these Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

WHEREFORE, Relator Relators demand judgment in their favor on behalf of the United States and against Defendants Shoals Hospital, LifePoint, River Region,

Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT NINE
## REVERSE FALSE CLAIMS AGAINST PRIME DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. §3729(a)(1)(G)

223.  Relators adopt and incorporate paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

224.  By and through the fraudulent schemes describe herein, Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit: Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili knowingly submitted false claims to the United States and received funds based on false claims in violation of the FCA and Anti-Kickback Statute, yet these Defendants took no

action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

WHEREFORE, Relator Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT TEN
## CONSPIRACY TO SUBMIT FALSE CLAIMS AGAINST LIFEPOINT DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. §3729(a)(1)(C)

225.   Relators adopt and incorporate paragraphs 1-14; 18-130 and 182 as though fully set forth herein.

226.   Defendants Shoals Hospital and LifePoint, in concert with each other and Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili, knowing conspired to present or cause to present false or fraudulent claims for payment or approval, conspired to make or use, a false record or statement material to a false or fraudulent claims and conspired to conceal or knowingly and improperly avoid or

decrease obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(C) to wit:

(a) Defendants Shoals Hospital and LifePoint agreed with Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili to violate material conditions of payment of the Medicare IPF PPS in order to fraudulently maximize revenue from the IPF PPS;

(b) Defendants Shoals Hospital and LifePoint and Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili did perform acts in furtherance of this conspiracy, including unnecessarily admitting and retaining patients in the Shoals IPF and making false documents to conceal such fraud;

(c) Because of this conspiratorial agreement and acts in furtherance of the agreement, Defendants Shoals Hospital, LifePoint River Region, Alabama Psychiatry and Dr. Yalamanchili received funds from the Medicare program for false and non-payable IPF services.

227. The United States, unaware of the falsity or fraudulent nature of the claims that these Defendants caused, paid for claims that otherwise would not have been allowed. Defendants' false representations were material to the government's decision to pay the IPF claims submitted.

228. Defendants Shoals Hospital and LifePoint's fraudulent actions, in concert with Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili, have resulted in damage to the United States equal to the amount paid by the United States as a result of these Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Shoals Hospital, LifePoint, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal

to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT ELEVEN
## CONSPIRACY TO SUBMIT FALSE CLAIMS AGAINST PRIME DEFENDANTS AND YALAMANCHILI DEFENDANTS
## 31 U.S.C. §3729(a)(1)(C)

229. Relators adopt and incorporate paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

230. Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, in concert with each other and Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili, knowing conspired to present or cause to present false or fraudulent claims for payment or approval, conspired to make or use, a false record or statement material to a false or fraudulent claims and conspired to conceal or knowingly and improperly avoid or decrease obligations to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(C) to wit:

(d) Defendants Prime, Prime—Gadsden, LLC, and Riverview Regional agreed with Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili to violate material conditions of payment of the Medicare IPF PPS in order to fraudulently maximize revenue from the IPF PPS;

(e) Defendants Prime, Prime—Gadsden, LLC, Riverview Regional and Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili did perform acts in furtherance of this conspiracy, including unlawfully interfering with Dr. Boodoo's reasonable medical judgment, unnecessarily

admitting retaining patients in the Riverview IPF and making false documents to conceal such fraud;

(f) Because of this conspiratorial agreement and acts in furtherance of the agreement, Defendants Prime, Prime—Gadsden, LLC, Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili received funds from the Medicare program for false and non-payable IPF services.

231. The United States, unaware of the falsity or fraudulent nature of the claims that these Defendants caused, paid for claims that otherwise would not have been allowed. Defendants' false representations were material to the government's decision to pay the IPF claims submitted.

232. Defendants Prime, Prime—Gadsden, LLC, and Riverview Regional's fraudulent actions, in concert with Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili, have resulted in damage to the United States equal to the amount paid by the United States as a result of these Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendants Prime, Prime—Gadsden, LLC, and Riverview Regional, River Region, Alabama Psychiatry and Dr. Yalamanchili, jointly and severely, in an amount equal to treble the damages sustained by reason of these Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relators may be entitled.

## COUNT TWELVE
## UNLAWFUL RETALIATION AGAINST LIFEPOINT DEFENDANTS
## 31 U.S.C. § 3730(h)

233.   Relator Wilkerson adopts and incorporates paragraphs 1-14; 18-130 and 182 as though fully set forth herein.

234.   Relator Wilkerson engaged in protected activity while employed as Medical Director of the Shoals IPF, including refusing the LifePoint Defendants persistent demands to unnecessarily admit and retain Medicare patients in Shoals IPF and by reporting concerns of unnecessary admission through Shoals Hospital internal Quality Assurance Reports.  Relator Wilkerson engaged in this protected activity in an effort to prevent the LifePoint Defendants violation of the False Claims Act.

235.   In violation of 31 U.S.C § 3730(h), Defendants Shoals Hospital and LifePoint retaliated against Relator Wilkerson's because of his efforts to prevent violations of the FCA.  This retaliation included terminating Relator Wilkerson as Medical Director of the Shoals IPF.

236.   As a result of Defendants Shoals Hospital and LifePoint's retaliatory conduct, Relator Wilkerson has suffered damages of extended periods of lost pay, including contractual damages due to the early termination of the medical director contract, and harm to his personal and professional reputation.

WHEREFORE, Relator Wilkerson demands judgment against Defendants Shoals Hospital and LifePoint in the amount of two times the amount of back-pay accrued since Relator Wilkerson's termination, interest on that back-pay, and compensation for special damages caused by Defendants Shoals Hospital and LifePoint's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C § 3730(h)(2).

## COUNT THIRTEEN
## UNLAWFUL RETALIATION AGAINST YALAMANCHILI
## DEFENDANTS
## 31 U.S.C. § 3730(h)

237.   Relator Boodoo adopts and incorporates paragraphs 1-12, 15-77, 131-182 as though fully set forth herein.

238.   Relator Boodoo engaged in protected activity while employed by Alabama Psychiatry, LLC, including refusing the Prime and Yalamanchili Defendants persistent demands to unnecessarily admit and retain Medicare patients in the Riverview IPF and alerting Defendant Yalamanchili of the illegality of his and Prime's demands.  Relator Boodoo engaged in this protected activity in an effort to prevent violations of the False Claims Act.

239.   In violation of 31 U.S.C § 3730(h), Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili retaliated against Relator Boodoo because of his

efforts to prevent violations of the FCA.  This retaliation included terminating Relator Boodoo's employment with Alabama Psychiatry.

240.   As a result of Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili's retaliatory conduct, Relator Boodoo has suffered damages of extended periods of lost pay, undue hardship forced upon Relator Boodoo and harm to his personal and professional reputation.

WHEREFORE, Relator Boodoo demands judgment against Defendants River Region, Alabama Psychiatry and Dr. Yalamanchili in the amount of two times the amount of back-pay accrued since Relator Boodoo's termination, interest on that back-pay, and compensation for special damages caused by these Defendant's discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C § 3730(h)(2).

**RELATORS DEMAND A TRIAL BY STRUCK JURY**

/s/ *Brandy Lee*
BRANDY M. LEE
Lee Law Firm, LLC
2100 First Avenue North
Suite 600
Birmingham, Alabama
Tel: 205.328.9445
Fax: 800.856-9028
brandy@leelawfirmllc.com

JAMES F. BARGER JR. (ASB-2336-m76b)
J. ELLIOTT WALTHALL (ASB-0967-e58w)
Attorneys for Relators
FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel:     205.933.4006
Fax:     205.933.4008
Email: jim@frohsinbarger.com
            elliott@frohsinbarger.com


**OF COUNSEL**

Lee Law Firm, LLC
2100 First Avenue North
Suite 600
Birmingham, Alabama
Tel: 205.328.9445
Fax: 800.856-9028
brandy@leelawfirmllc.com


FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel: 205.933.4006
Fax: 205.933.4008

## **CERTIFICATE OF SERVICE**

On or before April 30, 2021, Plaintiffs-Relators hereby certify that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the Qui Tam Complaint has been executed as follows:

By Certified Mail to:
United States Attorney for the Northern District of Alabama
Attn.: Assistant U.S. Attorney Clinton Richardson
1801 4th Avenue North
Birmingham, AL 35203


By Certified Mail to:
Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


Of Counsel

89