FILED

2023 Mar-30  PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. ANDREW D. WILKERSON, M.D. and RAMNARINE BOODOO, M.D,** } } } } } | |
| **Plaintiffs,** } } | |
| **v.** } } | **Case No.: 2:21-cv-00569-ACA** |
| **RCHP-FLORENCE, LLC, d/b/a SHOALS HOSPITAL; PRIME HEALTHCARE SERVICES— GADSDEN, LLC; RIVER REGION PSYCHIATRY ASSOCIATES, LLC; ALABAMA PSYCHIATRY, LLC; AND SHANKAR B. YALAMNCHILI,** } } } } } } } } } | |
| **Defendants.** } } | |

## MEMORANDUM OPINION

Plaintiffs/Relators Dr. Andrew D. Wilkerson and Dr. Ramnarine Boodoo filed this *qui tam* action alleging that two separate hospitals, operating two different inpatient psychiatric facilities, fraudulently billed Medicare and conspired at different times with Defendant Shankar B. Yalamanchili and at least one of two limited liability companies Dr. Yalamanchili owns. Dr. Wilkerson and Dr. Boodoo's amended complaint asserts claims under the federal False Claims

Act, 31 U.S.C. § 3729 *et seq.* and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

This is the second federal lawsuit involving similar factual allegations and claims. Dr. Boodoo previously voluntarily dismissed claims against two of the defendants in this case after those defendants moved to dismiss the first lawsuit. Dr. Boodoo, along with Dr. Wilkerson, then filed this case, adding a number of defendants and claims.

Currently before the court are Defendants' motions to dismiss Dr. Boodoo and Dr. Wilkerson's amended complaint. (Docs. 49, 51, 52). For the reasons explained below, the court **WILL GRANT IN PART** and **WILL DENY IN PART** the motions to dismiss.

## I. BACKGROUND

### A. The Parties

There are two relators in this case, Dr. Wilkerson and Dr. Boodoo. (Doc. 4 at 5–6 ¶¶ 15–16, 6 ¶ 19). There are five defendants, Defendant RCHP-Florence, LLC ("Shoals Hospital"); Prime Healthcare Services—Gadsden, LLC ("Prime"); River Region Psychiatry Associates, LLC; Alabama Psychiatry, LLC; and Dr. Shankar Yalamanchili. (*Id.* at 4 ¶¶ 10–14). How these relators and defendants are connected to each other is vital to understanding this case.

Shoals Hospital and Prime are unrelated hospitals, both of which run inpatient psychiatric facilities that independently contracted with either Dr. Yalamanchili or one of his two companies, River Region and Alabama Psychiatry. (*See* doc. 40 at 5 ¶¶ 13–14, 34 ¶ 121, 43 ¶ 142). Dr. Yalamanchili is the president and founder of River Region, a group medical practice providing inpatient psychiatric services, and he is the sole member of Alabama Psychiatry, which also contracts with inpatient psychiatric facilities. (*Id.* at 4 ¶¶ 10–12). The complaint alleges that River Region is a division of Alabama Psychiatry (*id.* at 4 ¶ 12), but the two LLCs are in fact separate entities (*see* doc. 68-1; doc. 68-2[1]).

In 2017, Shoals Hospital's inpatient psychiatric facility (the "Shoals IPF") hired Relator Dr. Wilkerson, a psychiatrist, to serve as its medical director. (Doc. 40 at 22 ¶ 78). Dr. Wilkerson served in that role until May 2020. (*Id.* at 6 ¶ 20). Shoals Hospital then hired Dr. Yalamanchili "and his physician practices (River Region Psychiatry and Alabama Psychiatry)" to serve medical director at the Shoals IPF. (*Id.* at 4 ¶ 10, 5 ¶ 13, 34 ¶ 121).

Unrelatedly, Prime's inpatient psychiatric unit (the "Riverview IPF") hired Alabama Psychiatry to provide medical director services at an undisclosed date.

---

[1] Doc. 68-1 and 68-2 contain the business records on file at the Alabama Secretary of State's Office for Alabama Psychiatry and River Region. The court takes judicial notice of the business records. *See* Fed. R. Evid. 201(b)(2) (explaining that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The articles of organization for Alabama Psychiatry state that Dr. Yalamanchili is the sole member of Alabama Psychiatry. (Doc. 68-1 at 6).

(Doc. 40 at 5 ¶ 14, 43 ¶ 142). Relator Dr. Boodoo worked for Alabama Psychiatry in 2018 and 2019 and provided inpatient psychiatric services at the Riverview IPF under the direction of Dr. Yalamanchili. (*Id.* at 5–6 ¶ 15, 43 ¶ 142).

B.    Procedural History

In December 2019, Dr. Boodoo filed a complaint against several defendants, including Prime[2] and Dr. Yalamachili. *United States ex rel. Ramnarine Boodoo v. Prime Healthcare Services, Inc., et al.,* Case No. 2:19-cv-1952-RDP, Doc. 2 ("2019 Complaint"). The allegations against Prime and Dr. Yalamanchili in that case are substantially similar to the allegations against Prime and Dr. Yalamanchili in this case. (*Compare* 2019 Complaint at doc. 2 at 3–6 ¶¶ 7–16 *with* Doc. 40 at 42 ¶ 141, 45 ¶¶ 148–150, 46 ¶¶ 151–153, 47 ¶ 157, 48 ¶¶ 160, 163–164, 49 ¶¶ 164–166, 62 ¶ 202). The defendants moved to dismiss Dr. Boodoo's 2019 Complaint. (Case 2:19-cv-1952-RDP, docs. 23, 27). They argued, among other things, that the 2019 Complaint failed to plead violations of the False Claims Act with requisite specificity as required by Federal Rule of Civil Procedure 9(b). (*Id.*). In December 2020, in advance of the court ruling on the motions, Dr. Boodoo voluntarily dismissed the 2019 Complaint pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (Case 2:19-cv-1952-RDP, doc. 31).

---

[2] Dr. Boodoo misnamed Prime as several other entities, but it is clear from the allegations in the 2019 complaint—and no parties dispute—that he intended to assert claims against Prime in the 2019 lawsuit.

In April 2021, Dr. Boodoo joined forces with Dr. Wilkerson and filed in this case an eighty-five page, thirteen count complaint containing 240 separate allegations. (Doc. 1). Five months later, the government declined to intervene. (Doc. 5). In February 2022, each defendant filed motions to dismiss, and the court entered a briefing schedule placing the motion under submission on March 16, 2021. (Docs. 22, 26, 29, 30, 32, 37). As one of its grounds for their dismissal, each defendant argued that the complaint failed to meet the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b). (Docs. 22, 29, 32).

On March 9, 2022, the plaintiffs filed an amended complaint that is eighty pages long and contains fourteen counts and 276 allegations. (Doc. 40). They also filed a response in opposition to the motions to dismiss, arguing that the court should deny the motions as moot in light of their amended complaint. (Doc. 41). After unrelated motion practice (docs. 42, 56, 57), the defendants refiled motions to dismiss (docs. 49, 51, 52) and those motions were fully briefed (docs. 50, 51-2, 52-2, 59, 60, 61, 62, 63, 64). The motions to dismiss the operative complaint came under submission in April 2022.

C.    The Claims

The amended complaint asserts fourteen claims in various combinations of relators and defendants. For ease of the reference, the court will describe the claims

brought by the two relators together, followed by the claims each relator brings individually.

Both Dr. Boodoo and Dr. Wilkerson assert:

(1) all defendants presented false claims by billing in violation of Medicare rules and laws, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) ("Counts One, Two, Three");

(2) River Region, Alabama Psychiatry, and Dr. Yalamanchili presented false claims by upcoding professional fee services, in violation of § 3729(a)(1)(A) ("Count Four");

(3) Shoals Hospital, Prime, River Region, Alabama Psychiatry, and Dr. Yalamanchili violated the False Claims Act, § 3729(a)(1)(A), by violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("Counts Five(a) and Five(b)[3]");

(4) Shoals Hospital, Prime, River Region, Alabama Psychiatry, and Dr. Yalamanchili made or used false statements in connection with false claims, in violation of the False Claims Act, § 3729(a)(1)(B) ("Counts Six and Seven");

(5) Shoals Hospital, Prime, River Region, Alabama Psychiatry, and Dr. Yalamanchili violated the False Claims Act, § 3729(a)(1)(G), by avoiding payment of money due to the government ("Counts Eight and Nine");

(6) Shoals Hospital, River Region, Alabama Psychiatry, and Dr. Yalamanchili conspired to violate the False Claims Act, § 3729(a)(1)(C) ("Count Ten"); and

(7) Prime, River Region, Alabama Psychiatry, and Dr. Yalamanchili conspired to violate the False Claims Act, § 3729(a)(1)(C) ("Count Eleven").

---

[3] The amended complaint contains two counts labeled "Count Five." (Doc. 40 at 69, 71). For clarity, the court refers to the first Count Five as Count Five(a). The court refers to the second Count Five as Count Five(b).

(Doc. 40 at 63–79). In addition to their joint claims, Dr. Wilkerson asserts that Shoals Hospital retaliated against him, in violation of the False Claims Act, 31 U.S.C. § 3130(h) ("Count Twelve"), and Dr. Boodoo asserts that River Region, Alabama Psychiatry, and Dr. Yalamanchili retaliated against him, in violation of § 3130(h) ("Count Thirteen"). (*Id.* at 79–81).

D.   The Facts

The court accepts as true the factual allegations in the amended complaint and construes them in the light most favorable to Dr. Wilkerson and Dr. Boodoo. *See Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). But the court need not consider "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005).

Before describing the allegations, the court must address the elephant in the room, an issue that must be clear to anyone reading this opinion closely: the fact that this complaint is a shotgun pleading. Shotgun pleadings are those that violate Federal Rules of Civil Procedure 8(a)(2) and 10(b). *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). One type of shotgun pleading is a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Id.* at 1323. The amended complaint does just that. It attempts to

7

ignore the legal truth that Dr. Yalamanchili, Alabama Psychiatry, and River Region are separate entities by grouping these defendants together and referring to the group as the "Yalamanchili Defendants." (Doc. 40 at 2 ¶ 1). This attempt to "confuse the 'enemy[]'" and the court failed. *See Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021). For the most part, the term "Yalamanchili Defendants" is used in the context of conclusory allegations. (*See, e.g., id.* at 6 ¶ 18, 36 ¶ 129, 44 ¶ 145, 45 ¶ 147, 53 ¶ 181). So, the court has, in compliance with the Supreme Court's instructions, ignored those allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

In the few places where the grouping led to confusion, the court was able to ascertain which defendant engaged in the conduct based on the allegations taken as a whole. For example, with respect to the contract at Shoals Hospital, the only claim against Alabama Psychiatry is through reference to the "Yalamanchili Defendants" but there is nothing in the amended complaint that supports a reasonable inference of Alabama Psychiatry's direct involvement with Shoals Hospital. One of the three allegations relates to admitting patients to the hospital. (Doc. 40 at 37 ¶ 135). But based on the allegations in the complaint, which the court must accept as true, there is no support for the allegation that two business entities—either Alabama Psychiatry or River Region—have the authority to admit patients.

The two remaining allegations relate to billing and upcoding. (*Id.* at 36 ¶¶ 129–130). The amended complaint makes clear that River Region provided billing services for its physicians, which included Dr. Yalamanchili. (Doc. 40 at 4 ¶ 11). And Dr. Yalamanchili performed all the services at Shoals Hospital according to the amended complaint. (*Id.* at 35 ¶¶ 124, 127–28). Thus, the reasonable inference is that billing related to work at Shoals Hospital was performed by River Region. Accordingly, nothing in the amended complaint raises a reasonable inference that Alabama Psychiatry engaged in any conduct connected to the Shoals Hospital contract.

Regarding the contract at Prime, the amended complaint contains no allegations suggesting River Region was directly involved with services at the Riverview IPF. Despite representations in a previous complaint, *see supra*, that Alabama Psychiatry contracted with Prime, Dr. Boodoo now alleges in a conclusory fashion that River Region was part of the contract too. (Doc. 40 at 42 ¶ 140). But elsewhere, the amended complaint alleges affirmatively that Alabama Psychiatry alone had the contract with Prime and that Alabama Psychiatry (not River Region) supplied its physicians, including Dr. Boodoo and Dr. Yalamanchili, to administer medical director services at the Riverview IPF. (*Id.* at 42 ¶ 141, 43 ¶ 142).

These are just a sampling of the allegations in the amended complaint that make the pleading an impermissible shotgun complaint. The Eleventh Circuit has "little tolerance" for such pleadings because they not only violate the Federal Rules of Civil Procedure but also "waste scarce judicial resources, inexorably broaden the scope of discovery, wreak havoc on appellate court dockets, and undermine the public's respect for the courts." *Barmapov*, 986 F.3d at 1324 (quotation marks and citations omitted). And "a district court that receives a shotgun pleading should strike it and instruct counsel to replead the case—even if the other party does not move the court to strike the pleading." *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020); *see also Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357–58 (11th Cir. 2018).

In a typical case, the court would have done just that. But as explained *supra*, Dr. Boodoo, Dr. Yalamanchili, Prime, and Riverview Medical Center have been involved in litigation over the same facts that form the basis of the second amended complaint since December 2019. The amended complaint in this case represents Dr. Boodoo's third attempt and Dr. Wilkerson's second attempt to state claims that can survive a motion to dismiss. As discussed below, even after these successive tries, Dr. Boodoo and Dr. Wilkerson have each pleaded only one plausible claim. Ordering Dr. Boodoo and Dr. Wilkerson to file a second amended complaint to address shotgun pleading deficiencies would lead to additional waste

of the court's and the parties' resources. The defendants would have re-filed redundant motions to dismiss that the parties would have briefed about the same claims that for the reasons stated below, largely fail to state a claim. Therefore, under the unique circumstances of this particular case, repleading the amended complaint to cure shotgun deficiencies is not in the interest of justice.

With that background in mind, the court sets out the factual allegations contained in the amended complaint.

### 1.    *Shoals IPF Alleged False Claims*

Shoals Hospital operates the Shoals IPF. (Doc. 40 at 5 ¶ 13). In November 2017, Shoals Hospital contracted with Dr. Wilkerson's employer, Serenus Senior Care Advisors, LLC, to provide professional psychiatric services to the Shoals IPF. (*Id.* at 22 ¶¶ 77–78). Pursuant to the agreement, Dr. Wilkerson served as medical director of the Shoals IFP and as a member of the Shoals Hospital medical staff. (*Id.* at 22 ¶ 78). In his role as medical director, Dr. Wilkerson was responsible for monitoring and evaluating the quality and appropriateness of services and treatment that medical staff provided to patients. (*Id.* at 23 ¶ 80).

Dr. Wilkerson alleges that while serving as medical director, Shoals Hospital administration pressured him to improperly admit and retain patients at the Shoals IPF in violation of its own admission criteria and Medicare guidelines. (Doc. 40 at 23 ¶¶ 82–84, 24 ¶¶ 84, 86, 88, 25 ¶¶ 88–89, 91, 29 ¶ 105, 30 ¶ 106). Dr. Wilkerson

claims he was "consistently at odds" with Shoals Hospital Chief Operating Officer/Chief Financial Officer Bradley Boggus because Dr. Wilkerson opposed Shoals Hospital's efforts to admit and retain ineligible patients in the Shoals IPF. (*Id.* at 31 ¶ 108). The disagreements reached a tipping point in August 2019, and Dr. Wilkerson submitted his resignation to Mr. Boggus. (*Id.* at 32 ¶ 111).

Shortly after, Mr. Boggus convinced Dr. Wilkerson to remain as the medical director at the Shoals IPF. (*Id.* at 32 ¶ 112). But Dr. Boggus quickly began interfering with Dr. Wilkerson's medical decisions and again pressured Dr. Wilkerson to admit and retain more patients at the Shoals IPF. (Doc. 40 at 33 ¶ 115).

When Dr. Wilkerson refused Dr. Boggus's demands, Shoals Hospital terminated Dr. Wilkerson and his medical company's contract. (*Id.* at 33 ¶ 117). Shoals Hospital hired Dr. Yalamanchili, River Region, and Alabama Psychiatry, to replace Dr. Wilkerson as the new medical director for Shoals IPF. (*Id.* at 34 ¶¶ 121–122).

Dr. Wilkerson has reviewed medical records of Dr. Yalamanchili's admissions at Shoals Hospital. (*Id.* at 35 ¶ 128). Dr. Wilkerson claims that based on these records, Dr. Yalamanchili falsely documents for services not performed, does not admit patients with legitimate psychiatric diagnoses, and retains patients in the Shoals IPF without justification. (*Id.* at 35–36 ¶ 128). Dr. Wilkerson also

alleges that Dr. Yalamanchili, River Region, Alabama Psychiatry, and Shoals Hospital are upcoding for standard care services. (*Id.* at 36 ¶ 129).

The amended complaint alleges that Dr. Yalamanchilli, River Region, and Alabama Psychiatry improperly admitted three patients (patients A, B, and C) to the Shoals IPF and improperly billed their care to Medicare on CMS Form 1450 by the billing department at Shoals Hospital under Mr. Boggus's direction. (Doc. 40 at 37–41 ¶¶ 135–138). Dr. Wilkerson alleges that for patients A, B, and C, Dr. Yalamanchili falsely documented or certified (1) that the patients were eligible for admission to the Shoals IPF when in fact they did not qualify for admission because they did not have a legitimate psychiatric diagnosis; (2) that he performed certain psychiatric services when he did not; and (3) that the patients were eligible for continued care, which lengthened their stay in the Shoals IPF. (*Id.* at 37–41 ¶¶ 136–138).

The amended complaint contains a chart outlining the dates of services and amounts billed for patients A, B, and C. (*Id.* at 37–41 ¶¶ 136–138). Based on those amounts and Dr. Yalamanchili's false certifications for those patients, the amended complaint alleges that (1) Dr. Yalamanchili caused the submission of false claims and (2) Shoals Hospital submitted false claims in the amount of $11,084.40 for patient A; $10,044.96 for patient B; and $15,194.75 for patient C. (*Id.*).

Dr. Wilkerson alleges that Shoals Hospital submitted and continued to submit false claims for patients A, B, C, and "many others" during Dr. Yalamanchili's medical directorship through Shoals's annual cost report. (Doc. 40 at 41–42 ¶ 139).

### 2.    *Riverview IPF Alleged False Claims*

Through a contract between Prime and Alabama Psychiatry, Alabama Psychiatry held the medical director contract and supplied its physicians to perform the medical director services at the Riverview IPF. (*Id.* at 43 ¶ 142). In June 2018, Dr. Boodoo, through his employment with Alabama Psychiatry, began providing psychiatric care services at the Riverview IPF. (*Id.* at 6 ¶ 15, 42 ¶ 140, 43 ¶ 142). Dr. Boodoo worked as the attending physician for patients admitted to the Riverview IPF. (*Id.* at 42 ¶ 140). In this role, Dr. Boodoo was responsible for monitoring and evaluating the quality and appropriateness of services and treatment for patients at the Riverview IPF. (Doc. 40 at 42 ¶ 140). In addition, Dr. Boodoo was responsible for certifying that inpatient psychiatric facility admission was medically necessary. (*Id.*).

The amended complaint alleges that Dr. Yalamanchili and Prime management interfered with Dr. Boodoo's judgment and pressured him to admit Medicare patients to the IPF regardless of medical necessity and to retain patients

for specific amounts of time even if they did not qualify for care in the IPF. (*Id.* at 42 ¶ 141, 45–47 ¶¶ 148–154, 157, 48–49 ¶¶ 163–64, 51 ¶ 173).

In September 2019, Dr. Yalamanchili told Dr. Boodoo that there had "been multiple issues surrounding complaints from referral sources and concerns about premature discharge of patients at the Riverview IPF. (*Id.* at 62 ¶ 202). Dr. Yalamanchili told Dr. Boodoo that if he did not follow Prime's length-of-stay mandates, Dr. Boodoo would be in breach of his employment contract with Alabama Psychiatry. (Doc. 40 at 62 ¶ 202). When Dr. Boodoo refused to follow Dr. Yalamanchili's instructions, Dr. Yalamanchili terminated Dr. Boodoo's employment with Alabama Psychiatry. (*Id.* at 40–41 ¶¶ 202–206, 208–209).

The amended complaint alleges that Prime, Dr. Yalamanchili, River Region, and Alabama Psychiatry falsely billed Medicare for treatment for certain Riverview IPF patients who either did not qualify for admission or who were retained longer than Dr. Boodoo believed was medically necessary. (*Id.* at 53 ¶181). Dr. Boodoo alleges the claims for three patients (patients D, E, and F) are false because: (1) the Riverview IPF did not utilize written admission criteria and did not apply any written admission criteria uniformly to both Medicare and non-Medicare patients; (2) the patients' admissions were not reasonable and necessary in Dr. Boodoo's judgment, and therefore, violated admission criteria; (3) the Riverview IPF could not and did not provide required active treatment for these

patients; and (4) bills for the patients were tainted by kickbacks. (*Id.*). The amended complaint contains a chart outlining the dates of services and amounts billed for patients D, E, and F. (Doc. 40 at ¶¶ 54–58 ¶¶ 185–191). Based on those amounts and Dr. Yalamanchili's alleged false certifications for those patients, the amended complaint alleges that (1) Dr. Yalamanchili caused the submission of false claims and (2) Prime submitted false claims in the amount of $8,595.79 for patient D; $7,164.00 for patient E; and $2,327.38 for patient F. (*Id.* at 54–58 ¶¶ 185–192).

The amended complaint also alleges that annual cost reports show the government paid various amounts of false claims to Prime throughout 2018 and 2019. (*Id.* at 59 ¶ 193–194).

## II.   DISCUSSION

"To survive a motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In addition, claims under the False Claims Act must satisfy Federal Rule of Civil Procedure 9(b). *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2008).

To state a claim of fraudulent billing activity in violation of the False Claims Act, "a plaintiff must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts,

when they occurred, and who engaged in them." *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (quotation marks omitted); *see also* Fed. R. Civ. P. 9(b). And because "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies," an alleged violation must contain some indicia of reliability to plausibly allege the presentation of "*an actual false claim for payment being made to the Government.*" *Clausen*, 290 F.3d at 1311 (emphasis in original).

The court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins,* 470 F.3d at 1358. For example, a plaintiff can satisfy the indicia of reliability requirement by submitting copies of bills or payments or by alleging amounts charged, actual dates, policies about billing, or information about billing practices. *Clausen*, 290 F.3d at 1312. Although Rule 9(b) does "does not mandate all of [that] information for [each] alleged claim[,] . . . some of [the] information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id.* at 1312 n.21. In the absence of details about specific claims, a plaintiff can satisfy the indicia of reliability standard by alleging "personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012).

A.   Counts One, Two, Three, Four, Five(a), and Five(b)
      (Presentment Claims)

Counts One, Two, Three, Four, Five(a) and Five(b) of the amended complaint assert what are known as "presentment claims" against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). (Doc. 40 at 63–72). This section of the False Claims Act imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 39 U.S.C. § 3729(a)(1)(A). To state a claim under § 3729(a)(1)(A), a complaint must contain sufficient indicia of reliability to support the assertion that the defendants actually submitted false claims. *Atkins*, 470 F.3d at 1358–59.

Defendants contend, among other things, that Counts One, Two, Three, Four, Five(a), and Five(b) do not contain sufficient indicia of reliability that any of the defendants actually submitted a false claim. (Doc. 50 at 12–37; doc. 51-1 at 16–35; doc. 52-1 at 13–35). Dr. Wilkerson and Dr. Boodoo respond that they have provided detailed descriptions of claims related to representative patients at Shoals Hospital and Prime. (Doc. 59 at 23–28; doc. 60 at 25–28; doc. 61 at 33–35). The court disagrees.

Starting with Shoals Hospital, the amended complaint contains allegations about three patients whom Dr. Wilkerson believed either did not qualify for admission to the Shoals IPF or received medically unnecessary care. (Doc. 40 at 37–41 ¶¶ 135–138). The amended complaint contains a chart for each of those

18

patients that lists the date of service and the "false claim amount billed" for each day, and alleges a total amount for each patient's stay. (*Id.*). But the amended complaint contains no specific facts showing how Dr. Wilkerson arrived at the "false claim amount billed" for each patient. He is not employed by Shoals Hospital, does not allege that he has knowledge of its billing procedures, and does not allege the date the claims were presented for payment or who made that presentment. Without allegations regarding the date it was presented, what was presented, and how it was presented, the claims against Shoals Hospital fail as a matter of law. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) ("In short, Corsello provided the 'who,' 'what,' 'where,' 'when,' and 'how' of improper practices, but he failed to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government.").

The information about representative patients from Prime likewise falls short. The amended complaint contains allegations about three patients whom Dr. Boodoo believed were improperly admitted or received medically unnecessary care at the Riverview IPF. (Doc. 40 at 53–58 ¶¶ 181–192). This may constitute improper practices, but it does not constitute indicia of reliability that Prime submitted a false claim to the government. *See Clausen*, 290 F.3d at 1311.

For each of the representative patients, the amended complaint contains a chart listing the dates of service and a "false claim amount billed" for each date.

(Doc. 40 at 55 ¶ 185, 56–57 ¶ 188, 40 ¶ 191). It also alleges a total amount claimed for each patient's stay. (*Id.* at 55 ¶ 186, 57 ¶ 189, 58 ¶192). But there are no allegations in the amended complaint of who, what, where, when, and how of any fraudulent submissions to the government. *See Corsello*, 428 F.3d at 1014. Although the amended complaint alleges generally that the Riverview IPF billing department submitted claims for the representative patients on claim format ASC X12 8371 (*id.* at 55 ¶ 185, 56 ¶ 188, 58 ¶ 191), there are no specific facts about the claims, what they were for, who submitted them, or how they arrived at the false claim amount billed. Therefore, the amended complaint does not plausibly allege that Prime asked the government to pay an actual false claim.

Dr. Wilkerson and Dr. Boodoo also argue that year end billing data covering the period of time they allege Shoals Hospital and Prime were admitting and retaining medically unnecessary psychiatric patients are representative false claims. (Doc. 59 at 22–23; doc. 60 at 23–25; doc. 61 at 31–33). Not so. The amended complaint cites year end cost reports and alleges that Medicare paid Shoals Hospital and Prime a certain amount of money in false claims for particular time periods. (Doc. 40 at 41 ¶ 139, 41 ¶¶ 193–194). But it contains no source or factual support for these sums, nor does it link those amounts to the presentment of an actually false claim. Instead, the amended complaint alleges in a conclusory fashion that Medicare paid false claims. (*Id.*). These allegations do not satisfy

Dr. Wilkerson and Dr. Boodoo's obligation under Rule 9(b) to plead specific facts plausibly showing the actual submission of a false claim.

Dr. Wilkerson and Dr. Boodoo cannot otherwise establish any indicia of reliability because neither Dr. Wilkerson nor Dr. Boodoo has personal knowledge of the submission of any false claims or the defendants' billing practices. Dr. Wilkerson claims to have "witnessed" Dr. Yalamanchili and Shoals Hospital "submit and cause the submission of false claims." (Doc. 40 at 35 ¶ 126). Dr. Boodoo claims to have "witnessed numerous instances in which" Prime, Dr. Yalamanchili, Alabama Psychiatry, and River Region "falsely billed Medicare." (*Id.* at 40 ¶ 181). But the amended complaint contains no facts showing how either Dr. Wilkerson or Dr. Boodoo was in a position to witness such conduct.

Dr. Wilkerson was not employed by any of the defendants. He merely provided psychiatric services to patients at the Shoals IPF. (*Id.* at 6 ¶ 20, 22 ¶¶ 77–78). There is no allegation in the amended complaint showing that Dr. Wilkerson had any relationship to Prime, Dr. Yalamanchili, River Region, or Alabama Psychiatry. The amended complaint fails to allege that Dr. Wilkerson had knowledge of any of these defendants' billing procedures, particularly with respect to the actual presentment of any claim. In fact, any allegation that Dr. Yalamanchili individually presented claims for payment fails because there is nothing in the amended complaint to support that allegation.

Dr. Wilkerson alleges that after he was terminated as the medical director of the Shoals IPF, he continued to have admitting privileges and treated patients at the center. (Doc. 40 at 34 ¶ 123). Thus, he claims to have knowledge of certain patients' conditions, their treatment, and their discharge. (*Id.* at 35 ¶ 124). But this knowledge does not plausibly allege the submission of an actual false claim to the government for any of these patients. Therefore, even if the Shoals IPF improperly admitted and treated some patients, Dr. Wilkerson alleges no facts showing how he has knowledge that Shoals Hospital actually submitted false claims for those services. *See Atkins*, 470 F.3d at 1358–59 ("[C]it[ing] particular patients, dates and corresponding medical records for services that [the plaintiff] contend[ed] were not eligible for government reimbursement" did not sufficiently "provide the next link in the [False Claims Act] liability chain: showing that the defendants *actually submitted* reimbursement claims for the services [the plaintiff] describe[d].") (emphasis in original).

The same is true for Dr. Boodoo. There are no allegations in the amended complaint that Dr. Boodoo has access to or knowledge of Prime's billing department or procedures. Dr. Boodoo was employed by Alabama Psychiatry, of which Dr. Yalamanchili was the sole member. (Doc. 40 at 5–6 ¶ 15; doc. 68-1 at 6). But the amended complaint contains no allegation that Dr. Boodoo had knowledge about Alabama Psychiatry's or Dr. Yalamanchili's billing department

or protocol. Therefore, there is no indicia of reliability for Dr. Boodoo's presentment allegations.

The only allegation in the amended complaint about actual billing practices is that River Region bills for services of its physicians. (*Id.* at 4 ¶ 11). But Dr. Boodoo has no connection to River Region. Again, the amended complaint identifies Dr. Boodoo as an Alabama Psychiatry physician and the contract with Prime provided that Alabama Psychiatry would provide its physicians to perform medical director services. (*Id.* at 43 ¶ 142). Given those terms, the court must assume that any services Dr. Yalamanchili provided at the Shoals IPF were done individually or on behalf of Alabama Psychiatry. Therefore, River Region could not have billed for any psychiatric services performed at the Riverview IPF.[4]

Dr. Wilkerson and Dr. Boodoo rely on *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1358 (11th Cir. 2005), to support their argument that the allegations in the amended complaint are sufficient to show why they believe the defendants submitted false claims. (Doc. 59 at 19–20; doc. 60 at 21–22; doc. 61 at 28–31). *Walker* does not assist Dr. Wilkerson or Dr. Boodoo.

In *Walker*, the Eleventh Circuit affirmed the denial of the defendant's motion to dismiss an employee's complaint alleging that the defendant

---

[4] On one occasion, the amended complaint alleges in conclusory fashion that Alabama Psychiatry, Dr. Yalamanchili, and River Region "falsely billed Medicare" for services provided at the Riverview IPF operated by Prime. (Doc. 40 at 53 ¶ 181). The court cannot infer from this conclusory allegation that River Region actually submitted claims for services patients received at the Riverview IPF.

fraudulently billed Medicare for services rendered by nurse practitioners and physician assistants as if those services were rendered "incident to the service of a physician" even though the defendant knew that the billed services did not meet necessary criteria for such billing. *Walker*, 433 F.3d at 1353, 1360. The plaintiff, a nurse practitioner, based her claim on personal knowledge and supported this allegation by recounting at least one personal conversation with the defendant's office administrator during which the office administrator explained that the defendant had always and exclusively billed all nurse practitioner and physician assistant services as rendered "incident to the service of a physician." *Id.* Based on these facts, the Eleventh Circuit held the allegations sufficiently explained why the plaintiff believed her employer submitted false claims for services rendered by nurse practitioners and physician assistants "incident to the services of a physician." *Id.*

The facts of this case are distinguishable from those alleged in *Walker*. In an attempt to show personal knowledge, Dr. Wilkerson relies on "alleged numerous conversations and interactions with [Shoals] COO/CFO Bradley Boggus and other employees who informed [him] that Shoals sought to admit inappropriate patients to the Shoals IPF, in violation of its own required admission criteria and Medicare IPF admission criteria." (Doc. 60 at 21) (citing doc. 40 at 23–31 ¶¶ 82–107). Dr. Wilkerson also relies on allegations that Shoals employees provided him with

manipulated clinical information with the intent to induce him to admit inappropriate and more profitable Medicare patients. (Doc. 60 at 21) (citing doc. 40 at 24–25 ¶¶ 87–90). All of Dr. Wilkerson's claims assume that the pressure that he alleges Shoals placed on him persisted after Dr. Yalamanchili, River Region, and Alabama Psychiatry took over and that those defendants acquiesced to those demands. That assumption does not constitute personal knowledge.

Dr. Boodoo alleges that he had conversations with the director of psychiatric ward at the Riverview IPF and the Riverview IPF unit manager who both told him to admit Medicare patients even if they did not require inpatient psychiatric treatment. (Doc. 59 at 19–20) (citing doc. 40 at 45 ¶ 150, 47 ¶¶ 154, 157). In addition, Dr. Boodoo maintains that Dr. Yalamanchili's statement to him that "we can just keep people as long as we want and we can always make an excuse later and Medicare will have to pay us" provides a basis for his belief that Dr. Yalamanchilli, River Region, and Alabama Psychiatry submitted false claims. (Doc. 59 at 20) (quoting doc. 40 at 61 ¶ 199). Like Dr. Wilkerson's allegations, Dr. Boodoo's allegations raise an inference of improper practices, but they do not establish personal knowledge of the presentation of any false claim.

Unlike *Walker*, Dr. Wilkerson's and Dr. Boodoo's conversations were general in nature and do not establish a billing procedure. In addition, their conversations were with employees who had no personal knowledge of the

defendants' billing practices. By contrast, in *Walker*, the office administrator had knowledge of the improper billing protocol. Dr. Wilkerson and Dr. Boodoo's reliance on alleged "improper practices" do not support "the inference that fraudulent claims were submitted" because submission of a fraudulent claim cannot be "inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Thus, neither Dr. Wilkerson nor Dr. Boodoo has pleaded any facts "explain[ing] how their access to possibly relevant information translated to knowledge of <u>actual false claims presented to the government</u>." *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1278 (11th Cir. 2018) (emphasis added).

Accordingly, the court **WILL GRANT** the motions to dismiss Counts One, Two, Three, Four, Five(a), and Five(b).

<u>B.</u>   <u>Counts Six and Seven (Make or Use Claims)</u>

Counts Six and Seven of the amended complaint assert what are known as "make or use" claims against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). (Doc. 40 at 72–75). This section of the False Claims Act imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To state a make or use claim, a plaintiff must allege facts showing: "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim."

*United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017).

Although § 3729(a)(1)(B) does not require that a defendant itself present a false claim to the government, a relator still must plead that the defendant makes or uses a false statement material to an actual false <u>claim</u>. *See Clausen*, 290 F.3d at 1311 ("The submission of a [false] claim is . . . the *sine qua non* of a False Claims Act violation."). As explained above, *see supra* pp. 18–26, the amended complaint fails to allege the existence of any false claim with particularity. Therefore, Counts Six and Seven likewise fail to state a claim. *See Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496, 503 (11th Cir. 2021)[5] ("Relators have failed to plead a false claim with particularity, so their false statement claim must also be dismissed.").

Accordingly, the court **WILL GRANT** the motions to dismiss Counts Six and Seven.

C.      Counts Eight and Nine (Reverse False Claims)

Counts Eight and Nine assert claims against Defendants under what is known as the "reverse false claims" provision of the False Claims Act. (Doc. 40 at 75–76). This section of the False Claims Act imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement

_____

[5] The court finds *Helmly* persuasive. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1060–61 (11th Cir. 2022); *see also* 11th Cir. R. 36-2.

material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Liability under this section "results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." *Matheny*, 671 F.3d at 1222.

Counts Eight and Nine allege that Defendants "knowingly submitted false claims to the United States and received funds based on false claims" but they "took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States." (Doc. 40 at 75 ¶ 258, 76 ¶ 260). But again, as explained above, *see supra* pp. 18–26, the amended complaint does not allege with particularity the submission of any false claim, and as a result, it does not plead that Defendants received any payments based on those alleged false claims that they were obligated to repay to the government. Therefore, Counts Eight and Nine fail to state a claim.

Dr. Wilkerson and Dr. Boodoo argue that the court should not dismiss Counts Eight and Nine because they have alleged that Defendants "avoided obligations that arose independent of any false certifications." (Doc. 59 at 36; doc. 61 at 42). But Dr. Wilkerson and Dr. Boodoo's briefs do not identify any such allegation contained in the amended complaint, and the court has not located any.

Accordingly, the court **WILL GRANT** the motions to dismiss Counts Eight and Nine.

### D.    Counts Ten and Eleven (Conspiracy)

Counts Ten and Eleven allege that Defendants conspired to violate the False Claims Act. (Doc. 40 at 77–80). The False Claims Act imposes liability on any person who "conspires to commit a violation" of the Act. 31 U.S.C. § 3729(a)(1)(C). To state a claim for conspiracy under the False Claims Act, a plaintiff must allege facts showing: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Corsello*, 428 F.3d at 1014.[6]

Counts Ten and Eleven allege that Defendants conspired to: (1) present or cause to be presented false claims (§ 3729(a)(1)(A)); (2) make or use false statements material to false claims (§ 3729(a)(1)(B)); and (3) conceal or knowingly and improperly avoid or decrease obligations to pay or transmit money or property to the government (§ 3729(a)(1)(G)). (Doc. 40 at 77 ¶ 262, 78 ¶ 266).

---

[6] *Corsello* interpreted a previous version of the False Claims Act. The Eleventh Circuit has not clarified "whether damages remain a required element under the new conspiracy provision." *United States v. HPC Healthcare, Inc.*, 723 F. App'x. 783, 791 n.4 (11th Cir. 2018).

Defendants argue that Counts Ten and Eleven fail to state a claim for two reasons: (1) the amended complaint does not allege an underlying violation of the False Claims Act, and (2) the amended complaint does not plead with particularity the nature of any conspiracy. (Doc. 50 at 38–29; doc. 51-1 at 36–37; doc. 52-1 at 37). The court agrees.

Defendants do not cite, and the court has not located, any binding authority requiring dismissal of a False Claims Act conspiracy claim in the absence of a viable underlying claim. But at least one circuit court of appeals and some district courts within the Eleventh Circuit and others have adopted this approach. *See, e.g., United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011) (affirming dismissal of conspiracy claim because complaint failed to state claims under presentment and make or use sections of the False Claims Act), *superseded by statute on other grounds*; *United States ex rel. Marsteller v. Tilton*, 556 F. Supp. 3d 1291, 1317 (N.D. Ala. 2021) ("[T]he court agrees that there was no conspiracy to fraudulently induce FMS contracts by submitting misleading pricing information to the Army because, as explained above in subsection A(2), the defendants did not commit an underlying FCA violation."); *United States ex rel. Coppock v. Northrup Grumman Corp.*, 2003 WL 21730668, at *14 n.17 (N.D. Tex. July 22, 2003) (finding that conspiracy claims under the False Claims Act are "governed by traditional notions of civil conspiracy" which "generally is not viable without the

commission of an underlying wrongful act" and dismissing False Claims Act conspiracy claims where the court dismissed the underlying False Claims Act claim on which the conspiracy claim was based).

The court finds this reasoning persuasive and adopts it. Thus, because the amended complaint does not plausibly allege violations of §§ 3729(a)(1)(A), (B), or (G)—the sections of the False Claim Act upon which the conspiracy claim is premised—Counts Ten and Eleven fail to state a claim.

Counts Ten and Eleven also fail to state a claim because the amended complaint does not plead with particularity that Defendants conspired with one another to get a false claim paid. Dr. Wilkerson and Dr. Boodoo's briefs cite (and at times mischaracterize) certain allegations in their amended complaint that they argue support their conspiracy claims. (Doc. 59 at 29 & doc. 61 at 36–37 (citing doc. 40 at 45 ¶¶ 149–150, 47 ¶ 157, 48–49 ¶¶ 160, 162–65, 40 ¶¶173–174, 40 ¶ 202, 63 ¶¶ 209–210); doc. 60 at 28 (citing doc. 40 at 31 ¶ 108, 33 ¶118, 36–37 ¶¶ 132–134, 136, 38–42 ¶¶ 136–139)). At best, these allegations might show that Defendants agreed to violate certain Medicare regulations. But they do not plead with any specificity an agreement to submit an actual false claim or to get a false claim paid by the government.

Accordingly, the court **WILL GRANT** the motions to dismiss Counts Ten and Eleven.

E.       Counts Twelve and Thirteen (Retaliation)

Counts Twelve and Thirteen allege that Shoals Hospital retaliated against Dr. Wilkerson (Count Twelve) and that Dr. Yalamanchili, Alabama Psychiatry, and River Region retaliated against Dr. Boodoo (Count Thirteen), in violation of the False Claims Act, 31 U.S.C. § 3730(h)(1). (Doc. 40 at 79–81).

To state a claim for retaliation under the False Claims Act, a plaintiff must show that he engaged in protected activity and that there is a causal connection between the retaliation and the protected activity. *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1358 (11th Cir. 2020) (to sufficiently allege a causal connection between protected activity under the False Claims Act and an adverse action, a plaintiff must "show that the harm he suffered would not have occurred in the absence of, that is, but for his protected conduct") (cleaned up); *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303–04 (11th Cir. 2010).

In 1986, Congress added an anti-retaliation provision to the False Claims Act which prohibited employers from discriminating against an employee "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h) (1986). Congress amended the False Claims Act in 2010 and expanded the types of conduct protected by the statute. Now, for purposes of the

False Claims Act, protected activity includes "lawful acts done by the employee, contractor, agent or associated others [1] in furtherance of an action under [the False Claims Act] or [2] other efforts to stop 1 or more violations of [the False Claims Act]." 31 U.S.C. § 3730(h)(1).

Before the amendment, the Eleventh Circuit interpreted § 3730(h) to protect employees "when there was at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions." *Sanchez*, 596 F.3d at 1303 (citing *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996)). In *Sanchez*, the Eleventh Circuit held that a plaintiff satisfies the "distinct possibility" burden if the plaintiff's warnings were sufficient "to support a reasonable conclusion that the defendants were aware of the possibility of litigation under the False Claims Act." *Id.* at 1304.

Since the amendment, the Eleventh Circuit has recognized that the scope of protection is broader because "the amendments expanded retaliation coverage to at least some set of people who make 'efforts to stop' False Claims Act violations— even if those efforts do not lead to a lawsuit or to the 'distinct possibility' of a lawsuit." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021). But the Eleventh Circuit has not changed its standard to reflect the change in the statute. *Id.*; *see id.* at 1289 (declining to examine whether the "distinct possibility" approach applies to post-amendment retaliation claims because the

plaintiffs' retaliation claims failed to state a claim under either the "distinct possibly" or a "reasonable belief" standard).

### 1. Count Twelve (Retaliation Against Shoals Hospital)

Count Twelve alleges that Shoals Hospital fired Dr. Wilkerson and refused to pay a $50,000 early termination fee because he reported concerns of unnecessary admission through Shoals Hospital's internal quality assurance reports and because he refused to submit to persistent demands to unnecessarily admit and retain Medicare patients in the Shoals IPF. (Doc. 40 at 79–80).

Shoals argues that Dr. Wilkerson's retaliation claim fails to a state claim because (1) he has not alleged that he engaged in protected activity and (2) he has not alleged facts showing that anyone involved with his medical director contract was aware of the protected activity. (Doc. 51-1 at 37–41). The court disagrees.

At a minimum, the amended complaint's allegations with respect to the quality assurance reports plausibly allege protected activity under the False Claims Act. The Eleventh Circuit's decision in *Sanchez* is instructive. In that case, the Court reversed the district court's dismissal of a retaliatory discharge claim under the False Claims Act where a plaintiff's complaint alleged that "she complained about the defendants' unlawful actions and warned them that they were incurring significant criminal and civil liability" because those allegations supported "a

reasonable conclusion that that the defendants were aware of the possibility of litigation under the False Claims Act." *Sanchez*, 596 F.3d at 1304.

Here, Dr. Wilkerson submitted six quality assurance reports which cited the Shoals IPF's admission criteria and identified ways that Dr. Wilkerson believed Shoals Hospital management was selectively disregarding this mandatory admission criteria. (Doc. 40 at 26 ¶ 92). The amended complaint then alleges that through these quality assurance reports, Dr. Wilkerson "reported that by disregarding its own admission criteria, the Shoals IPF was admitting the inappropriate patients and causing false claims." (*Id.* at 26 ¶ 95). At least one of the quality assurance reports related to pressure Dr. Wilkerson received from Shoals Hospital management to admit patients who had a primary diagnosis of substance abuse or alcohol withdrawal. (*Id.* at 28 ¶ 101). According to the amended complaint, this quality assurance report "made clear" that any claims for this type of patient would be false. (Doc. 40 at 28 ¶ 101). These facts plausibly allege protected conduct under the False Claims Act because like *Sanchez*, they "are sufficient to support a reasonable conclusion" that Shoals "could have feared being reported to the government for fraud or sued in a *qui tam* action" by Dr. Wilkerson. *See Sanchez*, 596 F.3d at 1304.

Dr. Wilkerson's allegations also plausibly show that Shoals Hospital was aware of his protected activity. The amended complaint alleges that the quality

assurance reports that Dr. Wilkerson submitted were "the primary, internal, mechanism to report significant compliance and standard of care reports." (Doc. 40 at 26 ¶ 93). The amended complaint does not directly identify the individual or individuals with decision-making authority regarding Dr. Wilkerson's position or whether they received notice of the quality assurance reports. But it is reasonable to infer that if Dr. Wilkerson used the "primary . . . mechanism" for reporting compliance and standard of care issues to hospital management, then someone with Shoals Hospital management was aware of Dr. Wilkerson's allegations that violations of the Shoals IPF admission criteria were causing false claims. (*See id.* at 26 ¶¶ 93–95, 28 ¶101).

Moreover, after he had provided some of the quality assurance reports, Dr. Wilkerson submitted his resignation to Shoals COO/CFO Mr. Boggus in August 2019, and it was Mr. Boggus who convinced Dr. Wilkerson to remain as medical director. (*Id.* at 32 ¶¶ 111–112). This allegation shows that Mr. Boggus was one of the individuals with control over the medical director contract, and as the COO of Shoals Hospital, it is plausible that Mr. Boggus would be aware of the contents of quality assurance reports filed by staff.

In addition, although the amended complaint does not allege that Dr. Wilkerson ever directly told Mr. Boggus that admission or retention of certain patients would result in false claims, on at least one occasion after Dr. Wilkerson

refused to admit a substance abuse patient (the very type of patient whose admission one of the quality assurance reports indicated would result in false claims (*see* doc. 40 at 28 ¶ 101)) to the Shoals IPF, Mr. Boggus instructed Dr. Wilkerson to admit more Medicare patients and retain them longer (*id.* at 31 ¶ 108). This allegation makes it plausible that Mr. Boggus knew Dr. Wilkerson complained that admitting certain patients was causing false claims.

At the pleading stage, these allegations plausibly show that someone involved with Dr. Wilkerson's contract with the Shoals IPF was aware of his protected activity.

Accordingly, the court **WILL DENY** Shoals Hospital's motion to dismiss Count Twelve.

> 2.    *Count Thirteen (Retaliation Against Dr. Yalamanchili, River Region and Alabama Psychiatry)*

Count Thirteen alleges that Dr. Yalamanchili, River Region, and Alabama Psychiatry terminated Dr. Boodoo's employment with Alabama Psychiatry because he refused demands to unnecessarily admit and retain Medicare patients at Riverview IPF and because he alerted Dr. Yalamanchili of the illegality of those demands. (Doc. 40 at 80–81).

In their motion to dismiss, Dr. Yalamanchili, River Region, and Alabama Psychiatry argue that the amended complaint "gathers" them "into a group and then applies the allegations to the group as a whole, without distinction among the

members." (Doc. 50 at 39). They contend that shared ownership among the entities does not eliminate the pleading requirement to "make clear and detailed statements as to each defendant's role and liability." (*Id.*). This argument is persuasive and mandates dismissal of the Count Thirteen to the extent it is asserted against Dr. Yalamanchili and River Region.

The amended complaint repeatedly alleges that Dr. Boodoo was an Alabama Psychiatry employee. (Doc. 40 at 5–6 ¶ 15, 43 ¶142, 80 ¶ 274). Because there is no allegation that Dr. Yalamanchili or River Region employed Dr. Boodoo, the amended complaint does not plausibly allege that either Dr. Yalamanchili or River Region could have retaliated against him. Dr. Yalamanchili is not personally liable for the acts of Alabama Psychiatry. *See* Ala. Code § 10A-5A-3.01 ("A member of a limited liability company is not liable, solely by reason of being a member, for a debt, obligation, or liability of the limited liability company."). And Dr. Boodoo and Dr. Wilkerson have not argued or demonstrated how River Region, as "a separate legal entity," *see* Ala. Code 10A-5A-1.04(a), can be liable for the acts of Alabama Psychiatry. Therefore, the court **WILL GRANT** the motion to dismiss Count Thirteen against Dr. Yalamanchili and River Region.

Alabama Psychiatry moves to dismiss Dr. Boodoo's retaliation claim, arguing that he did not engage in protected activity. (Doc. 50 at 40–42). The court disagrees.

Throughout his employment with Alabama Psychiatry, Dr. Boodoo had "numerous" conversations with Dr. Yalamanchili about the need for the Riverview IPF to adopt standardized admission criteria that would be applied consistently regardless of payor source. (Doc. 40 at 52 ¶ 180). According to Dr. Boodoo, such criteria would prevent the submission of false claims to Medicare. (*Id.*). Dr. Boodoo also notified Dr. Yalamanchili and an Alabama Psychiatry office manager via email that Dr. Yalamanchili's professional fee services billing template would result in upcoded charges because the template required noting that a patient was a "high level of risk" and that many patients who were admitted to the Riverview IPF did not meet that criterion. (*Id.* at 61 ¶ 201).

After Dr. Yalamanchili sent Dr. Boodoo a letter concerning complaints about premature patient discharge from the Riverview IPF and instructed him to comply with Riverview IPF's length of stay mandates, Dr. Boodoo sent Dr. Yalamanchili a text message that told him continued enforcement of the mandates "would be illegal," and he told Dr. Yalamanchili that he was "not breaking the law" for Prime or Alabama Psychiatry. (*Id.* at 62 ¶ 203; *id.* at 62 ¶ 202). Dr. Boodoo then told Dr. Yalamanchili that he would "not conspire with [Dr. Yalamanchili] to commit a crime." (Doc. 40 at 62 ¶ 204).

In addition, Dr. Boodoo complained to a local probate judge about the possibility that the Riverview IPF was causing false claims. (*Id.* at 49 ¶ 167). The

probate judge contacted Riverview administration about its IPF admissions and lengths of stay. (*Id.* at 50 ¶ 168). The probate judge also connected Dr Boodoo with the district attorney's office, and investigators with the district attorney's office interviewed Dr. Boodoo multiple times. (*Id.* at 49 ¶ 167).

Accepting these allegations as true, Dr. Boodoo's actions occurred when there was a distinct possibility he would file a False Claims Act lawsuit against Dr. Yalamanchili and Alabama Psychiatry. Therefore, the amended complaint plausibly alleges that Dr. Boodoo engaged in protected conduct. *See Sanchez*, 596 F.3d at 1303–04.

Accordingly, the court **WILL DENY** Alabama Psychiatry's motion to dismiss Count Thirteen.

## III.   CONCLUSION

The court **WILL GRANT IN PART** and **WILL DENY IN PART** Defendants' motions to dismiss the amended complaint.

The court **WILL GRANT** Dr. Yalamanchili, River Region, and Alabama Psychiatry's motion to dismiss Counts Three, Four, Five(a), Five(b), Six, Seven, Eight, Nine, Ten, and Eleven. The court **WILL GRANT** Dr. Yalamanchili and River Region's motion to dismiss Count Thirteen. The court **WILL DENY** Alabama Psychiatry's motion to dismiss Count Thirteen.

The court **WILL GRANT** Shoals Hospital's motion to dismiss Counts One, Five(a), Six, Eight, and Ten. The court **WILL DENY** Shoals Hospital's motion to dismiss Count Twelve.

The court **WILL GRANT** Prime's motion to dismiss Counts Two, Five(b), Seven, Nine, and Eleven.

The court **WILL DISMISS WITH PREJUDICE**: (1) Counts Three, Four, Five(a), Five(b), Six, Seven, Eight, Nine, Ten, and Eleven against Dr. Yalamanchili, River Region, and Alabama Psychiatry; (2) Count Thirteen to the extent it is asserted against Dr. Yalamanchili and River Region; (3) Counts One, Five(a), Six, Eight, and Ten against Shoals Hospital; and (4) all counts against Prime.

The court understands that if "a more carefully drafted complaint might state a claim," plaintiffs should be "given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1220 (11th Cir. 2022). The plaintiffs have had that opportunity. The amended complaint in this action represents Dr. Wilkerson's second attempt and Dr. Boodoo's third attempt to state claims against the defendants based on alleged submission of false claims and in response to multiple motions to dismiss in which the defendants put the plaintiffs on notice of the deficiencies with their claims. Therefore, the court will not permit further

amendment of the counts that fail to state a claim. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1057 (11th Cir. 2015) ("Three attempts at proper pleading are enough."); *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (a "district court need not" allow amendment if there has been "repeated failure to cure deficiencies by amendments previously allowed").

This will leave only two remaining claims joined in this action: a retaliation claim by Dr. Wilkerson against Shoals Hospital (Count Twelve), and a retaliation claim by Dr. Boodoo against Alabama Psychiatry (Count Thirteen). The court finds that these claims and parties are not properly joined under Federal Rules of Civil Procedure 18 and 20.

Rule 18 permits a party asserting a claim to "join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). Rule 20 permits the joinder of plaintiffs if they assert (1) "any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences"; and (2) "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). Rule 20 also permits joinder of defendants if (1) "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or

series of transactions or occurrences"; and (2) "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

Dr. Wilkerson has no retaliation claim against any defendant except Shoals Hospital, and that claim is not based on the same transaction or occurrence as Dr. Boodoo's retaliation claim against Alabama Psychiatry. Similarly, Dr. Boodoo has no claim against Shoals Hospital, and his retaliation claim against Alabama Psychiatry does not arise out of the same transaction or occurrence as Dr. Wilkerson's retaliation claim against Shoals. In addition, neither claim shares any question of fact.

Federal Rule of Civil Procedure 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, . . . sever any claim against a party." Fed. R. Civ. P. 21. Pursuant to Rule 21, the court is prepared to sever Dr. Wilkerson's retaliation claim against Shoals Hospital from Dr. Boodoo's retaliation claim against Alabama Psychiatry because they are misjoined.

If any party or the United States wishes to show cause why the court should not sever the two remaining claims in this manner, the party **SHALL** file a response **on or before April 6, 2023.**

**DONE** and **ORDERED** this March 30, 2023.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE